**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

FRANKLIN LEE DEJULIUS and
SUSAN M. DEJULIUS,

      Movants-Appellants,

v.

NEW ENGLAND HEALTH CARE
EMPLOYEES PENSION FUND, on
behalf of itself and all others similarly
situated, AMALGAMATED BANK, as
Trustee for the Longview Collective
Investment Fund, EMPLOYER-
TEAMSTER LOCAL NOS. 175 & 505
PENSION TRUST FUND, PACE
INDUSTRY UNION-MANAGEMENT
PENSION FUND, PLUMBERS &
PIPEFITTERS NATIONAL PENSION
FUND, and UNITED
BROTHERHOOD OF CARPENTERS
PENSION FUND,

      Plaintiffs-Appellees,

v.

SPRINT CORPORATION, WILLIAM
T. ESREY, RONALD T. LEMAY,
KEVIN E. BRAUER, ARTHUR B.
KRAUSE, ANDREW J. SUKAWATY,
JOHN E. BERNDT, THEODORE H.
SCHELL, THOMAS E. WEIGMAN,
DON A. JENSEN, BRUCE
BRANYAN, WILLIAM E.

No. 04-3091

McDONALD, MARTIN J. KAPLAN, GENE M. BETTS, JAMES RICHARD DEVLIN, MICHAEL B. FULLER, LEN J. LAUER, JOHN P. MEYER, ARTHUR ALLAN KURTZE, I. BENJAMIN WATSON, III,  LINDA KOCH LORIMER, DUBOSE AUSLEY, WARREN L. BATTS, MICHAEL BON, IRVINE O. HOCKADAY, JR., HAROLD S. HOOK, CHARLES E. RICE, LOUIS W. SMITH, RON SOMMER, and STEWART TURLEY,

Defendants-Appellees.

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 01-CV-04080-CM)**

---

Kenneth E. Nelson, Nelson Law Firm, P.C., Kansas City, Missouri, for Movants-Appellants.

Joseph D. Daley, (William S. Lerach, Keith F. Park, and Randall J. Baron; David R. Scott, Scott & Scott, LLC, Colchester, Connecticut, with him on the brief) Lerach Coughlin Stoia Geller Rudman & Robbins LLP, San Diego, California, for Plaintiffs-Appellees.

Eric J. Gorman, (Christina M. Tchen and Russell S. Jones, Jr., Shughart Thompson & Kilroy P.C., Kansas City, Missouri; J. Emmett Logan, Stinson Morrison & Hecker LLP, Kansas City, Missouri, with him on the brief) Skadden Arps Slate Meagher & Flom LLP, Chicago, Illinois, for Defendants-Appellees.

---

Before **EBEL, HOLLOWAY** and **LUCERO**, Circuit Judges.

---

**EBEL**, Circuit Judge.

This case deals with the legal and constitutional sufficiency of the class action notice program under Fed. R. Civ. P. 23 and the Due Process Clause. Appellants are unnamed class plaintiffs in an action against Appellee Sprint Corporation. The class action concerns alleged instances of securities fraud surrounding Sprint's failed merger attempt with WorldCom, Inc. Appellants received notice of a class settlement two weeks after the deadline for filing objections to the settlement and on the same day as the final fairness hearing on the settlement. After the district court approved the settlement between Sprint and its shareholders, Appellants moved to intervene, arguing that the attorneys' fees to be paid to class counsel pursuant to the settlement were excessive and that the notice afforded to class members of the settlement was insufficient under the Due Process Clause and Fed. R. Civ. P. 23. Appellants claim that since they held their shares in "street name" (meaning that they held only beneficial title to the shares while legal title was vested in their broker's name), the thirty-two-day period between the initial mailing of the settlement notice and the deadline for objections did not sufficiently account for the delays involved in forwarding notice packets to beneficial stock owners.

The district court held that the notice program was sufficient under Rule 23 and due process and denied the motion to intervene. For the reasons outlined below, we AFFIRM the judgment of the district court.

## BACKGROUND

### I. The parties

Defendant-Appellee Sprint Corporation ("Sprint") is in the telecommunications business, offering hardline and wireless long-distance service.[1] At the relevant time, Sprint was the third largest long-distance carrier in the United States and had annual revenues in excess of $17 billion. Sprint's common stock ("FON") and its wireless tracking stock ("PCS") are publicly held.

Lead Plaintiff-Appellee[2] New England Health Care Employees Pension Fund ("New England") is a large institutional investor that purchased publicly-traded Sprint securities. Pursuant to Section 101(b) of the Private Securities

---

[1]The class action complaint also names as defendants several high-level officers at Sprint and members of its Board of Directors. For the purposes of this opinion, when we use the term "Sprint," we are referring to all three categories of Sprint defendants: directors, officers, and the corporate entity. In addition, the complaint named WorldCom, Inc., and its former Chief Executive Officer, Bernard Ebbers, as defendants. The suit against WorldCom, Inc., was stayed pending the company's bankruptcy, and the claims against Ebbers were voluntarily dismissed.

[2]Plaintiffs and Defendants are on the same side for purposes of this appeal; both argue that the district court correctly denied Appellants' motion to intervene.

Litigation Reform Act of 1995,[3] the district court appointed New England to be the lead plaintiff in a consolidated class action against Sprint seeking damages suffered by investors as a result of Sprint's failed merger attempt with WorldCom, Inc. See In re Sprint Corp. Sec. Litig., 164 F. Supp. 2d 1240, 1242, 1244 (D. Kan. 2001) ("Sprint I"). Sprint and New England eventually reached a $50 million settlement, which the district court approved.

Movants-Appellants Franklin and Susan DeJulius are members of the class who filed a motion to intervene, claiming that the notice of settlement to class members was inadequate and that the fee requested by class counsel was excessive.

## II. Factual background

On October 4, 1999, after several months of intense negotiations, Sprint and WorldCom, Inc., agreed to the terms of a merger whereby WorldCom would acquire Sprint for $129 billion. See In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1201 (D. Kan. 2002) ("Sprint II"). At the time, both companies had massive market shares in the domestic and international telecommunications markets: Sprint was the nation's third largest provider of long distance telephone services while WorldCom was the second largest provider of international long

---

[3]Pub. L. No. 104-67, 109 Stat. 737 (codified in relevant part at 15 U.S.C. § 78u-4(a)(3)).

distance lines to American customers and the largest provider of domestically-connected international private voice and data lines. Id. The combination of the two companies was to be the largest corporate merger in history. Id.

Sprint and WorldCom shareholders approved the merger proposal on April 28, 2000. Id. However, on June 27, 2000, the Justice Department filed an antitrust suit to block the merger; the European Commission followed suit the next day. Id. By July 13, 2000, Sprint and WorldCom officially terminated the merger agreement. Id. at 1201-02.

Although the announcement of the merger initially had a positive impact on the value of PCS and FON shares, once the deal fell apart, stock values significantly decreased, causing investors to lose billions of dollars. Id. at 1210. Some investors felt that the proposed merger was simply a ruse designed to allow certain Sprint executives prematurely to exercise stock options. Id. at 1202. Under Sprint's long-term compensation plan, certain high-level executives were given stock options to buy millions of shares of Sprint FON/PCS common stock at prices well below market value. Id. In 1998, however, most of these options had not yet vested, which meant that Sprint executives could not yet exercise them. Id. According to Plaintiffs, Sprint executives were worried that Sprint stock prices would continue to fall, further decreasing the potential value of their unvested options. Id.

The incentive plan did, however, provide that should Sprint undergo a "change-in-control," the options would immediately vest and become exercisable. Id. Thus, the plaintiff class alleges that Sprint executives pushed for the WorldCom merger with full knowledge that it would never ultimately stand up to an antitrust challenge. Id. Once the shareholders approved the merger, stock prices would rise, the options would vest, and the executives could cash in their stock options at a substantial profit. Id. In fact, this is exactly what happened. William T. Esrey, the chairman and CEO of Sprint (and a named individual defendant in this suit), made over $300 million alone from his stock options. Id. The plaintiff class alleges that the total windfall for all stock option participants was in excess of $1.7 billion. Id. The downside was that once the merger failed, Sprint share prices tumbled. Id. at 1210. PCS shares dropped to $33.25, a forty-nine percent decrease from its high point of $65.50 after the merger agreement was announced. Id. Similarly, FON shares fell to $26.81, a sixty-one percent decrease from its high point of $68.76 after the merger agreement was announced. Id.

## III.    Procedural history

### A.    Consolidated complaint and dismissal of some claims

These events gave rise to three separate shareholder class actions, which were later consolidated into one complaint over which New England was the lead

plaintiff. The consolidated complaint alleged that Sprint made false and misleading statements in connection with the WorldCom merger, in violation of Section 10(b) of the Securities and Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78j(b) (2000), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2000), promulgated thereunder. The complaint also alleged Sprint and WorldCom violated Section 20(a) of the Act (codified at 15 U.S.C. § 78t(a)), a provision which provides for joint and several liability for any person who controls another that has violated the Act or any regulation promulgated thereunder.

Prior to class certification, Sprint filed a motion to dismiss the suit. Sprint II, 232 F. Supp. 2d at 1199. In a lengthy opinion, the district court agreed to dismiss nearly all of the plaintiff class' allegations, except for three paragraphs in the complaint dealing with misstatements and omissions made to the Department of Justice and the European Commission. Id. at 1230.

### B.     Settlement agreement

After the district court dismissed the bulk of the claims against Sprint, the parties entered into negotiations and, on April 7, 2003, agreed to settle the claims for $50 million. Under the terms of the agreement, the $50 million would be placed in a common settlement fund for class members and would be distributed to class members after attorneys' fees and other expenses were deducted. On October 29, 2003, the district court preliminarily approved the agreement,

conditionally certifying a settlement class and scheduling the final settlement hearing for December 16, 2003.

## C.    Notice & dismissal

The district court's preliminary approval mandated a number of procedures aimed at notifying absent class members of the settlement agreement and their rights to opt-out, object, or intervene in the proceedings before the settlement became final.

Along with their settlement agreement, the parties submitted several draft documents that would notify class members of the settlement and enable them to obtain their share of compensation from the settlement fund: (1) a Notice of Pendency and Proposed Settlement of Class Action (the "Notice"); (2) a Proof of Claim and Release; and (3) a Summary Notice. The Notice and Proof of Claim and Release ("the notice packet") were to be mailed directly to class members, while the Summary Notice would be published in newspapers and on the internet. Those documents specifically stated that any class member wishing to opt-out or raise an objection to the settlement must do so before December 2, 2003, two weeks before the final settlement hearing.

The district court approved the proposed materials and ordered certain notice procedures that it found to be "the best notice practicable" under the circumstances. Specifically, the court ordered that notice packets should be

mailed to all Sprint shareholders in the class within ten days, to the extent those persons were identifiable by Sprint records. In addition, the district court ordered that the summary notice be published on two separate occasions within twenty days of its order in the national edition of <u>Investor's Business Daily</u> and <u>The Kansas City Star</u>. To facilitate class notice and claim processing, the court appointed Gilardi & Co., LLC ("Gilardi") as the settlement administrator and ordered it to place all of the notice materials on its Web site.

With regard to the individual notice to class members, the district court recognized a potential problem since it appeared that many of the shareholders reflected in Sprint records were brokerage houses and it was thus likely that these entities held the shares only as "nominees" while the entities' clients held the beneficial title to the shares, also known as holding shares in "street name." The following background is useful:

> The practice of registering securities in the records of issuers in other than the name of the beneficial owner is commonly referred to as "nominee" and "street" name registration. Nominee name registration refers to arrangements used by institutional investors (insurance companies and investment companies among others) and financial intermediaries (brokers, banks and trust companies) for the registration of securities held by them for their own account or for the account of their customers who are the beneficial owners of the securities. Street name registration, a specialized type of nominee name registration, refers to the practice of a broker registering in its name, or in the name of its nominee, securities left with it by customers or held by it for its own account.

Securities and Exchange Commission, The Street Name Study,[4] 1 (1976),

reprinted in Robert W. Hamilton & Jonathan R. Macey, Cases and Materials on

Corporations Including Partnerships and Limited Liability Companies 674 (8th ed.

2003) (footnote omitted).  The primary benefit of this practice is to permit

beneficial owners easily and quickly to transfer ownership of their shares without

meeting the issuer's often cumbersome requirements, such as endorsing the back

of the stock certificate.  Id. at 675.  The downside, of course, is that the issuer's

records would not always reflect the true owners of the shares.  See id.

In order to address this problem, the district court in the instant case issued

special procedures for nominees who held shares on behalf of their clients during

the class period.  If a particular shareholder reflected in Sprint's records was a

nominee, that entity had two options.  The nominee could provide Gilardi with a

list of names and addresses of its clients who were the beneficial owners of the

Sprint shares.  Gilardi would then forward individual notice packets to each

investor.  Alternatively, the nominee could simply request the appropriate number

of notice packets from Gilardi and then forward the notices itself to the actual

owners.  Any costs associated with the mailing would be reimbursed from the

---

[4]The full name of this study is: Final Report of the Securities and Exchange
Commission on the Practice of Recording the Ownership of Securities in the
Records of the Issuer in Other Than the Name of the Beneficial Owner of Such
Securities.  For convenience, most commentators simply refer to it as "The Street
Name Study."  See Hamilton, infra, at 674 n.30.

settlement fund.  In any event, the nominee was required to complete this process within ten days of receiving the initial notice package from Gilardi.

On October 31, 2003 (just two days after the district court gave preliminary approval for the settlement), Gilardi obtained a list of shareholders from Sprint and mailed 37,081 notice packets to various individuals and entities.  As predicted, many of these packets were sent to nominees.[5]  Following the procedures set forth above, an additional 89,426 notice packages were sent out sometime before December 3, 2003, one day after the deadline for opt-out/objection deadline and nearly two weeks prior to the settlement hearing.[6]  Of these packages, 56,078 packages were mailed by Gilardi directly to potential class members (presumably from lists provided by nominees), and 33,342 packages were sent in bulk to nominees (for the nominees to forward on to their clients).[7]

No objections to the settlement were filed prior to the December 2, 2003, deadline, and as scheduled, the district court held a final settlement hearing two

_____

[5]The record also indicates that Gilardi took the initiative to send copies of the notice package to several major brokerage houses whose clients commonly hold stock in street name.

[6]The record contains no information as to precisely when these additional packets were sent directly to investors or to the nominees for forwarding.  All we know for certain is that as of December 3, 2003 (one day after the deadline to file objections), Gilardi had sent out an additional 89,426 notice packets.

[7]All of the required notice-by-publication apparently took place as required under the district court's preliminary approval of the settlement.

weeks later on December 16, 2003. At the conclusion of the hearing, the district court approved the settlement and dismissed the suit against Sprint.

### D. The motion to intervene

On December 18, 2003, Appellants filed a motion to intervene for the limited purpose of filing a motion for leave to file late objections to the settlement approved by the district court just two days earlier. Appellants sought their intervention both permissively and as of right. See Fed. R. Civ. P. 24(a)-(b). In a document attached to their motion, Appellants maintained that they did not receive notice of the class settlement until December 16, 2003, the very day of the fairness hearing and a full two weeks after the deadline for filing objections had passed. Appellants sought to object to the settlement on two grounds: (1) that the attorneys' fees requested by class counsel were unreasonable and excessive;[8] and (2) that the notice to the class was inadequate and constitutionally defective.

The district court held that the notice scheme, on the whole, was constitutionally adequate even though Appellants themselves did not receive timely notice of the settlement. It also noted that the issue regarding the fairness of the attorneys' fees had already been taken up and ruled upon at the final

---

[8]Class counsel requested, and the district approved (at the settlement hearing) an award of attorneys' fees not to exceed 17.5% of the settlement fund plus up to $375,000 in expenses.

settlement hearing. Accordingly, the district court denied the motion to intervene. This appeal followed.

As to the attorneys' fees, Appellants have not raised this issue in their opening brief and it is therefore waived. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994). Thus, the only remaining basis for intervention that Appellants assert on appeal is the notice issue.[9]

---

[9]In its brief, Sprint raises an additional waiver argument. Sprint observes that while Appellants' opening brief discusses extensively the adequacy of notice, it does not argue that the district court erred by failing to allow them to intervene. According to Sprint, "Appellants' failure to appeal the denial of intervention should deprive them of standing on appeal to assert the merits of the objection they sought to raise." Apparently, Sprint believes that Appellants should have included two issues in their brief: (1) whether the denial of intervention was inappropriate under Fed. R. Civ. P. 24; and (2) whether the notice to absent class members was inadequate.

This argument ultimately fails. When the district court ruled on the motion to intervene, it did not specifically discuss the legal standards under Rule 24 for permissive intervention or intervention as of right. Instead, the court focused on the issues of adequate notice and attorneys' fees. In other words, the court looked to the merits of the objections that Appellants would have filed if granted intervention. Finding those objections meritless, it then denied intervention. Putting aside the attorneys' fees issue, the only issue before the court when it decided the motion to intervene was whether notice was adequate to absent class members. By challenging the district court's holding that notice was adequate, Appellants are therefore impliedly challenging the court's decision to deny intervention.

## DISCUSSION

### I.     Jurisdiction

On December 16, 2003, the district court approved the settlement order and dismissed the suit. Two days later, Appellants filed a motion to intervene permissively and as of right. The district court denied that motion on February 24, 2004. Our appellate jurisdiction arises under 28 U.S.C. § 1291. <u>See</u> <u>Coalition of Ariz./N.M. Counties for Stable Economic Growth v. Dep't of the Interior</u>, 100 F.3d 837, 839 (10th Cir. 1996) (holding that "[a]n order denying intervention is final and subject to immediate review if it prevents the applicant from becoming a party to the action" and taking jurisdiction under § 1291).[10]

### II.     Standard of Review

Our review of rulings on motions to intervene as of right is <u>de novo</u>, and we review a denial of permissive intervention for abuse of discretion. <u>City of Stilwell v. Ozarks Rural Elec. Coop. Corp</u>, 79 F.3d 1038, 1042 (10th Cir. 1996).

---

[10]In <u>Coalition for Stable Economic Growth</u>, intervention was sought *prior* to the district court's final judgment in the case. <u>See</u> 100 F.3d at 839. Here, in contrast, the motion to intervene was filed two days after the district court entered a final judgment. The notice of appeal here was filed in late February, so it could not have been timely filed in relation to the final judgment, which was entered in mid-December. We believe, however, that if a denial of a motion to intervene is final for § 1291 purposes before judgment is entered in the action, then it should also be final if brought as a post-judgment motion. <u>See</u> <u>Guthrie v. Evans</u>, 815 F.2d 626, 628 (11th Cir. 1987) (noting that denial of an unnamed class member's motion to intervene is appealable).

The underlying question of whether a particular class action notice program satisfies the requirements of Fed. R. Civ. P. 23 and the Due Process Clause is a legal determination we review de novo. See Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1186 (10th Cir. 2002) (stating that due process issues, which call for legal conclusions, are subject to de novo review); Torrisi v. Tuscon Elec. Power Co., 8 F.3d 1370, 1374 (9th Cir. 1993) (applying de novo review to due process and Rule 23 issues regarding class action notice program). However, the district court's findings of fact regarding notice are reviewed under the clearly erroneous standard. See Fed. R. Civ. P. 52(a).

## III.   Intervention

Although this case arose in the context of Appellants' post-judgment motion to intervene, the district court, in its order denying the motion, never specifically mentioned the legal standards for intervention, which are laid out in Fed. R. Civ. P. 24. Instead, the district court proceeded directly to the merits of the two objections Appellant sought to raise if granted intervenor status: sufficiency of the notice and appropriateness of the attorneys' fees. Finding both of these objections to be without merit, the district court simply denied the motion to intervene.

Although our analysis ultimately turns on the merits of Appellants' putative objection to the notice procedures, we must first determine if the threshold

- 16 -

requirements of Rule 24 have been met. Fed. R. Civ. P. 24 provides, in relevant

part:

> **(a) Intervention of Right.** Upon timely application anyone shall be permitted to intervene in an action. . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

> **(b) Permissive Intervention.** Upon timely application anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . . In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Here, Appellants do not challenge the adequacy of the named class

representatives to protect their interests. The only asserted basis for intervention

is the adequacy of class notice procedures, an entirely separate issue from

adequacy of representation.[11]  Compare Fed. R. Civ. P. 23(a)(4) (adequacy of

representation), with Fed. R. Civ. P. 23(c)(2)(B) (requiring notice in actions

certified under Rule 23(b)(3)).  Thus, intervention as of right is not available to

Appellants.  See 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,

Federal Practice & Procedure § 1799, at 246 (3d ed. 2005) ("If the court

---

[11]As noted above, the other ground asserted below for intervention—the excessive nature of attorneys' fees—has not been raised on appeal and is thus waived.

determines that the absent class members are adequately represented, intervention as of right under Rule 24(a) should be unavailable. Intervention in this situation should be a matter that is left to the court's discretion under the standards for permissive intervention in Rule 24(b)(2).").

As for the standards for permissive intervention, it is clear that Appellants meet the requirement that their claim "have a question of law or fact in common" with the main action. Fed. R. Civ. P. 24(b). Where, as here, a class action is certified under Fed. R. Civ. P. 23(b)(3), it is required that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ." However, in deciding whether to permit intervention, the court is also required to consider whether the intervention will "unduly delay or prejudice" the adjudication of the rights of existing litigants. Fed. R. Civ. P. 24(b). The district court's conclusion that the notice procedures in this case were adequate (and therefore that Appellants' putative objection was meritless) can be read as a conclusion that the intervention Appellants sought would cause undue delay to the final disposition of the class settlement.

While our overall review of a motion to intervene permissively is for an abuse of discretion, here the district court rested its ruling on a legal conclusion: that the notice procedures were adequate under the Due Process Clause and Rule 23. An abuse of discretion occurs when a district court bases its ruling on an

erroneous conclusion of law. <u>Kiowa Indian Tribe v. Hoover</u>, 150 F.3d 1163, 1165 (10th Cir. 1998). Thus, if we conclude—under a <u>de</u> <u>novo</u> standard of review—that the district court incorrectly held the notice procedures to be adequate, we must reverse the district court's ruling on Appellants' motion to intervene.

## IV. Adequacy of the class notice procedures

### A. Applicable law

Under Fed. R. Civ. P. 23(e)(1)(B), a district court approving a class action settlement "must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." According to the advisory committee's note, "[r]easonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B)[, the rule governing class-certification notice,]" particularly when, as here, individual class members are required to file claims to collect from the settlement fund. Advisory Committee's Note, 2003 Amendments, Fed. R. Civ. P. 23, <u>reprinted in</u> <u>Federal Civil Judicial Procedure and Rules</u> 132-33 (West 2005 ed.). Rule 23(c)(2)(B) provides, in relevant part:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

In addition to the requirements of Rule 23, the constitution's Due Process Clause also guarantees unnamed class members the right to notice of certification or settlement.  See U.S. Const. amend. V; Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950); Eisen v. Carslisle & Jaquelin, 417 U.S. 156, 173 (1974).

> Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the case.

Mullane, 339 U.S. at 313.

In Mullane, the Court addressed whether publication notice (rather than mailed individual notice) to known beneficiaries of a common trust fund as part of a judicial settlement of accounts was constitutionally sufficient.  Id. at 307. Observing that notice and an opportunity to be heard were fundamental requisites of procedural due process, the Court held that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  Id. at 314; see also Eisen, 417 U.S. at 173 (concluding that some form of individualized notice is mandatory under Rule 23 and the Due Process Clause).  The Court continued:

> But when notice is a person's due, process which is a mere gesture is not due process.  The means employed must be such as one desirous

of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected . . . .

Mullane, 339 U.S. at 315. The Court held that publication notice could not satisfy due process where the names and addresses of the beneficiaries were known. Id. at 320.

Nevertheless, this due process right does not require *actual* notice to each party intended to be bound by the adjudication of a representative action. See id. at 313-14 ("A construction of the Due Process Clause which would place impossible or impracticable obstacles in the way could not be justified."); accord In re Integra Realty Res., Inc., 262 F.3d 1089, 1110-11 (10th Cir. 2001) ("Integra I") (holding Rule 23 and Due Process requisites satisfied where the record indicated that only seventy-seven percent of class members actually received notice of the settlement).

For due process purposes, rather than looking at actual notice rates, our precedent focuses upon whether the district court gave "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort." Integra I, 262 F.3d at 1110 (citing Eisen, 417 U.S. at 174) (quotation omitted). The legal standards for satisfying Rule 23(c)(2)(B) and the constitutional guarantee of procedural due process are coextensive and substantially similar. Compare Integra I, 262 F.3d at 1110 with

- 21 -

Fed. R. Civ. P. 23(c)(2)(B); see also Advisory Committee's Note, 1966 Amendments, Fed. R. Civ. P. 23, reprinted in Federal Civil Judicial Procedure and Rules 130 (West 2005 ed.) ("This mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject.").

Although the Tenth Circuit has not yet dealt with the appropriate method of sending settlement notices in a shareholder class action to class members who hold their shares in street name only, two decisions from the Ninth Circuit offer helpful guidance. In Torrisi, the Ninth Circuit held that notice provided to shareholders thirty-one days before the deadline for written objections and forty-five days before the fairness hearing was adequate under the Due Process Clause and Rule 23, despite the fact that nearly one-third of the 113,000 class members held their shares in street name. 8 F.3d at 1373, 1375. In so doing, the court noted that

> the question before us today is not whether some individual
> shareholders got adequate notice, but whether the class as a whole
> had notice adequate to flush out whatever objections might
> reasonably be raised to the settlement. If an individual shareholder
> later claims he did not receive adequate notice and therefore should
> not be bound by the settlement, he can litigate that issue on an
> individual basis when the settlement is raised as a bar to a lawsuit he
> has brought.[12]

---

[12]We expressly left open the possibility of individual class members

(continued...)

Torrisi, 8 F.3d at 1375. As further support, the Torrisi court pointed out that a number of "street name" shareholders actively participated in the litigation, filing objections and participating in the settlement hearing, tending to indicate that street name shareholders received fair notice despite the fact that only thirty-one days elapsed between the initial mailing and the objection deadline. Id. at 1375 n.2.

Similarly, the Ninth Circuit has also concluded that due process and Rule 23 were satisfied even when it was undisputed that a nominee forwarded nearly one-sixth of the settlement notices to beneficial owners after the opt-out deadline. See Silber v. Mabon, 18 F.3d 1449, 1452, 1454 (9th Cir. 1994). In Silber, the initial round of settlement notices were sent out to approximately 1,000 individual shareholders (identifiable in the company's records) forty days prior to the opt-out deadline. Id. Based on information from nominees, the settlement administrator then sent out over 5,000 additional notice packets to beneficial owners, either directly or by providing the packets to nominees for forwarding. Id. One of the nominees, PaineWebber, did not even request notice packets until just eight days before the opt-out deadline. Id. The settlement administrator sent these packets

---

[12](...continued)
bringing a due process claim based on lack of individual notice in a collateral effort to challenge the binding effect of the settlement as to them. Integra I, 262 F.3d at 1111 & n.18.

to PaineWebber on the day of the opt-out deadline, which then sent them to the beneficial owners. Id. While the objector in Silber received his notice after the opt-out deadline, he did receive notice approximately eleven days prior to the fairness hearing at which he appeared and unsuccessfully requested to opt-out.[13] Id. Holding the notice procedures sufficient under due process and Rule 23, the court noted that

> [w]hile [the objector] was fortuitously unable to exercise his right to opt out in a timely fashion, that fact alone does not mean that the best practicable notice under the circumstances was not given to absent class members. As the procedures in this case for notice to beneficial owners through brokerage houses conformed to [prior precedent], we affirm the judgment.

Id. at 1454.

**B.    Analysis**

Appellants' central claim on appeal is that the record indicates that 70.7% of the class members received fewer than thirty-two days' notice. This fact, while supported in the record, however, does not render the instant notice program deficient under the Due Process Clause or Rule 23.

Appellants derive the "70.7%" figure from the following facts: (1) An initial mailing of 37,081 notice packets was sent on October 31, 2003 (thirty-two days before the deadline) to various individuals and entities; (2) then, at some

---

[13]See fn. 14, infra.

point before December 2, 2003 (the opt-out deadline), an additional 89,426 notice packages were sent out to beneficial owners. Therefore, a total of 126,507 notice packages were mailed to shareholders with 89,426 (or 70.7%) of them sent sometime after the initial wave of mailings on October 31, 2003 but before December 3, 2003, one day after the deadline for opt-outs and written objections and nearly two weeks before the settlement hearing. Of these 89,426 packages, we also know that 56,078 packages were mailed by Gilardi directly to potential class members (presumably from lists provided by nominees), and 33,342 packages were sent in bulk to nominees (for the nominees to forward on to their clients).

Notably absent from the record, however, is any evidence indicating whether anyone other than Appellants received their notice after the deadline for objections and opt-outs or the settlement hearing. Indeed, Appellants conceded below (and thus would be bound to concede here) that it was possible for beneficial owners of nominee accounts to have received the notice as many as fourteen days prior to the objection deadline.

Appellees rely heavily on Torrisi, arguing that since a thirty-one-day notice period was deemed appropriate even though there were a substantial number of beneficial shareholders there who had to have notice passed on to them, the thirty-two-day period in the instant case must also be permissible. However, it is

worth pointing out that the percentage of beneficial owners in <u>Torrisi</u> is substantially less than it is here. In <u>Torrisi</u>, only one-third of the class members were contacted after the initial mailing based on names provided by nominees. 8 F.3d at 1374-75. Here, in contrast, the vast majority of shareholders (indeed 70.7% of them) held their shares beneficially. But like <u>Torrisi</u>, "the question before us today is not whether some individual shareholders got adequate notice, but whether the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement." 8 F.3d at 1375.

In <u>Silber</u>, the proportion of beneficial owners not included in the initial mailing was closer to eighty-three percent. <u>See</u> 18 F.3d at 1452 (initial mailing sent to approximately 1,000 shareholders, and an additional 5,000 mailings were sent to beneficial owners sometime thereafter). Thus, even when a substantial number of class members hold their shares in street name only, courts have found a notice scheme similar to the one in the instant case sufficient and have not required a sixty- or ninety-day notice period, as Appellants suggest.

Accordingly, we believe that in the instant case, particularly given the absence of any evidence that anyone other than Appellants received their notice after the deadline for objections or the settlement hearing, the initial and secondary rounds of mailings were sufficient to flush out any objections that might arise to the fairness of the settlement. Indeed, the only substantive

argument Appellants sought to raise if permitted to intervene—that the attorneys' fees were excessive—was specifically considered and rejected at the settlement hearing.

Furthermore, even if we accept as true Appellants' unsubstantiated assertion that "thousands of class members received their notice packet too late to respond," this does not necessarily mean that the notice program violated Rule 23 or the Due Process Clause. In <u>Silber</u>, the court found the notice scheme to be sufficient even when it was undisputed that 1,000 of the notices, or approximately seventeen percent, were sent out *after* the opt-out deadline. 18 F.3d at 1453-54. Here, it is undisputed that all of the notices were sent out nearly two weeks prior to the settlement hearing, and it is likely that a large number of the notices were sent out much earlier than that.

## CONCLUSION

We hold that the instant class action notice program satisfies the requirements of the Due Process Clause and Rule 23. Because the district court correctly reached this conclusion, it was not an abuse of discretion for the court to

deny Appellants' motion to intervene.[14]  We AFFIRM.

---

[14]We note that the instant case deals only with *class-wide* determinations of fairness and due process.  Appellants here do not seek individually to opt-out of the settlement or in any other way attempt to avoid its binding effect.  If this were Appellants' objective, the lack of actual notice *as to them* may have some due process implications.  We express no view, however, as to whether individual members of the class might be able to establish a lapse in due process because they lacked actual notice of the action, such that they might successfully challenge the binding effect of the settlement against them in a collateral action. See Integra I, 262 F.3d at 1111 n.18. Relevant to any such analysis might be the fact that the stockholders who chose to hold their share in street name do so at their own volition in reliance upon the nominee to protect their interests.  This is not to suggest that the class representative can ignore that fact, but it may be a factor to consider in the mix.