Dale **FAGER, Jr.; Michele D. Fager; Gunter–Miller Enterprises, Ltd., for themselves and all others similarly situated, Plaintiffs–Appellees,**

v.

**CENTURYLINK COMMUNICATIONS, LLC.; Level 3 Communications, LLC; WilTel Communications, LLC, Defendants–Appellees.**

**James Ziegler, Objector–Appellant.**

No. 15-2109

United States Court of Appeals, Tenth Circuit.

Filed August 29, 2016

the plaintiff received for holding a master's degree.

Steven Sugarman, Cerrillos, New Mexico, for Appellant.

Christopher J. Koenigs, Sherman & Howard, L.L.C., Denver, Colorado (Daniel J. Millea, and Eric E. Caugh, Zelle, Hoffman, Voelbel & Mason, LLP, Minneapolis, Minnesota, Kathleen C. Kauffman, Acerkson Kauffman Fex, PC, Washington, D.C., Michael B. Carroll, Sherman & Howard L.L.C. Denver, Colorado, Joseph Jones, Fraser Stryker PC LLO, Omaha, Nebraska, and Eric R. Burris, Brownstein Hyatt Farber Schreck, LLP, Albuquerque, New Mexico, with him on the brief) for Appellees.

Before HARTZ, BALDOCK, and McHUGH, Circuit Judges.

HARTZ, Circuit Judge.

James Ziegler appeals the district court's final approval of a class-action settlement agreement to resolve landowner claims against telecommunications companies for their installation of fiber-optic cable underneath railroad rights-of-way. He contends that class members did not receive adequate notice of the settlement and the settlement is unfair. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

In the 1980s, telecommunications companies sought to create a nationwide network of fiber-optic cable. *See In re WorldCom, Inc.*, 347 B.R. 123, 132 (Bankr. S.D.N.Y. 2006). Because railroad lines offered an existing grid with a limited number of owners, cable companies purchased from the railroads the right to lay cable within their rights-of-way. *See id.* Beginning in the 1990s, however, some who owned the land subject to the rights-of-way began to challenge the right to enter and install cable on the land, suing the telecommunications companies on various theories, including trespass. *See id.*

Property owners sought to proceed through nationwide class litigation but the

patchwork nature of railroad property rights and differences in state property law demanded caution. The rights-of-way were created by a variety of means and a variety of actors. The railroads obtained some through public land grants, *see Isaacs v. Sprint Corp.*, 261 F.3d 679, 680–81 (7th Cir. 2001), some through the exercise of the power of eminent domain, *see id.*; *Forwood v. Delmarva Power & Light Co.*, No. CIV. A. 10948, 1998 WL 136572, at *4 (Del. Ch. Mar. 16, 1998), and some through agreements with private landowners, *see* Jeffery M. Heftman, *Railroad Right-of-Way Easements, Utility Apportionments, and Shifting Technological Realities*, 2002 U. Ill. L. Rev. 1401, 1406–07 (2002). And the scope of the rights varied from one property to another. Some interests "did not include a right to use the right-of-way for non-railroad purposes" or may have lapsed altogether. *Cascade Corp. v. Sprint Commc'ns Co., L.P.*, 845 F.Supp.2d 328, 329 (D. Me. 2012); *see Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 987 (7th Cir. 2002) (the right-of-way may have lapsed, may have been limited to railroad purposes, or may have been broad enough to allow a conveyance to telecommunications companies). Thus, whether a railroad had the right to sell access to a cable company hinged upon analysis of "different conveyances by and to different parties made at different times over a period of more than a century (railroading began in the United States in the 1830s) in 48 different states (plus the District of Columbia) which have different laws regarding the scope of easements, . . . whose application involves intricate legal and factual issues . . . ." *Isaacs*, 261 F.3d at 682. Courts therefore repeatedly rebuffed attempts to certify what they saw as a "nightmare of a class action." *Id.*; *see Smith v. Sprint Commc'ns Co., L.P.*, 387 F.3d 612, 615 (7th Cir. 2004) (reversing certification of nationwide settlement class); *Cascade*, 845 F.Supp.2d at 330 (list-

ing failed certification efforts). *But see Fisher v. Virginia Elec. & Power Co.*, 217 F.R.D. 201, 214–15 (E.D. Va. 2003) (certification appropriate in fiber-optic class action because easements obtained by one company in two states involved only limited variations in law and terms of easement).

Although unable to certify a nationwide class, the parties continued negotiations. By 2007, with the help of a mediator, they agreed to terms on 46 separate statewide settlement agreements (excluded were Louisiana and Tennessee, represented by different class counsel, and Alaska and Hawaii). The parties sought approval of these agreements in the United States District Court for the District of Massachusetts. *See Kingsborough v. Sprint Commc'ns Co., L.P.*, 673 F.Supp.2d 24 (D. Mass. 2009). Under the proposed settlements, class members (unless they opted out) would receive compensation for each linear foot of affected property. *See id.* at 28. The amount received per foot would "vary greatly, based upon the parties' state-by-state analysis of the strengths and weaknesses of the claims and defenses at issue," arising from "the particularities of state laws with regard to the extent of the railroads' easements, whether continuing trespass is a viable claim, statutes of limitations, and applicable measures of damages." *Id.* In return, class members would release all claims against the telecommunications companies and against the railroads (who were not parties to the litigation), *see id.* at 29; and current landowners would "grant to the settling defendants and their successors, assigns, and licensees, a perpetual easement and right-of-way," *id.* at 28. To deal with class members who failed to provide easements, the district court would use Fed. R. Civ. P. 70 to authorize a claims administrator to execute and convey easements on behalf of those class members. *See id.* at 28–29. But

the court refused to approve the settlements, holding that it lacked jurisdiction over claims concerning title to land outside Massachusetts. *See id.* at 35.

The parties therefore agreed to present each statewide agreement for approval in an action commenced in that state. Hence the case before us, which concerns a proposed statewide settlement agreement submitted to the United States District Court for the District of New Mexico. The New Mexico Defendants are CenturyLink Communications, LLC; Level 3 Communications, LLC; and WilTel Communications, LLC. The class comprises current and former owners of property underneath or adjacent to 631 miles of railroad right-of-way. As Ziegler's attorney stated in district court, most of the rights-of-way are useless to the class members:

> Many landowners sort of look at the railroad right-of-way which is either adjacent to their land or transverses their land as sort of a no man's land. In almost every case, it is fenced on both sides. It's around 200 feet wide for most places in the state of New Mexico, and it is difficult to access. In Mr. Ziegler's case, there is a three-strand barbed wire fence on both sides of that easement that he needs to cross in order to find his way onto the easement. So a landowner might not be too concerned about what is going to be happening on that railroad right-of-way, but I can let the court know that a landowner is going to be very concerned about what happens on the . . . land adjacent to the right-of-way.

Fairness Hr'g Tr. at 61:23–62:12, Aplee. Supp. App. at 19–20.

The complaint asserted damage claims for trespass, unjust enrichment, and slander of title, and sought a declaration that Defendants had no right to use the rights-of-way for nonrailroad purposes and an order that they remove the existing cable. The parties reached a settlement agreement under which class members who do not opt out and submit qualified claims would receive either $0.75 or $1.25 (depending on the history of the title) for each linear foot of affected property. In return, the class members (on behalf of themselves and their successors-in-interest) would consent to an injunction barring them, roughly speaking, from asserting against Defendants or the railroads any past, present, or future claims relating to the rights-of-way or the fiber-optic cable, as well as any related equipment and structures. Also, those who currently own affected land would convey to Defendants permanent easements extending no more than 10 feet on either side of the cable system that would allow the ongoing presence of the cable and related equipment but not the installation of large structures. In addition, the easements would create rights of access to the rights-of-way over the adjacent land. Those rights, however, are very circumscribed. Of the right-of-access provision the district court wrote:

> It allows a Defendant to use the Grantor's property to access the right of way: only to repair or maintain its cable; only if the Grantor has an existing private road that provides access to the right of way (which will rarely be the case, and which means the Defendant cannot access any part of the Grantor's property other than such road); [3] only if access to the right of way from public or railroad roads is not reasonably practical (which again will rarely be the case); [4] only if the Defendant has made "commercially reasonable efforts to give prior notice to Grantor" of any use of the Grantor's road; and [5] only if the

Defendant remains liable for any damage to Grantor's property.

Memorandum Opinion and Order (Order) at 13–14, Aplt. App., Vol. 3 at 577–78. As in Massachusetts, the settlement provided that the court would appoint the claims administrator under Rule 70 to convey easements on behalf of class members who did not themselves convey. These provisions protect Defendants from having to go through litigation every few years (or oftener) on new trespass allegations. *See id.* at 13 ("[T]he easements ... are a crucial component of the settlement. Without them, Defendants would have no assurance that they will not be sued again (and again) by future owners of the properties.").

The district court granted preliminary approval to the settlement, certified the class, and approved the notice to class members. Five property owners chose to opt out. Ziegler was the only class member to raise objections, which he presented at length to the district court through pleadings and oral argument. The court rejected his objections and granted final approval to the settlement. Ziegler appeals that order. He complains that notice was inadequate, largely because an important property interest (an easement) was at stake, and that the settlement is unfair. We disagree. Notice by first-class mail was adequate, and he has failed to show that the agreement is unfair.

## II. DISCUSSION

### A. Notice

■ Ziegler complains that the notice to potential class members of the proposed settlement failed to satisfy constitutional due process. Due process requires notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). We have said that this standard is coextensive with the requirements of Fed. R. Civ. P. 23(c)(2), which states that class-action notice must be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See DeJulius v. New England Health Care Emps. Pension Fund*, 429 F.3d 935, 944 (10th Cir. 2005). We reject Ziegler's arguments that notice fell short.

To identify the class members and provide notice, class counsel hired a firm with expertise in class-action notice. It used a database created from county tax records, which contained the names and addresses of all owners of land along the railroad rights-of-way in 2003, then updated it through 2014. It thus included current landowners in 2014 as well as former owners. In January 2015 the claims administrator sent notice of the proposed settlement by first-class mail to 5,662 current and former landowners. Notice was also published in newspapers and magazines throughout New Mexico.

The address side of the envelope with the mailed notice identifies itself in bold-italic capitalized type above the return address as a "*COURT-ORDERED LEGAL NOTICE*." Notice, Aplee. Supp. App. at 39. Below the return address in red capitalized typeface are the words "IMPORTANT NOTICE ABOUT YOUR PROPERTY." *Id.* On the back cover appears the following in red type:

<div style="border:1px solid black;">

## If You Own or Owned Land Under or Next to Railroad Rights of Way Where Fiber-Optic Cable was Installed,

You Could Receive Money from a Class Action Settlement

</div>

*Id.* The first page of the notice itself provides a table listing the options available to each class member. Current landowners are warned that if they "Do Nothing" they will receive no payment and their property will be subject to an easement:

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
| --- | --- |
| SUBMIT A CLAIM FORM | The only way to get a payment. Claim Forms will be mailed after the Court grants final approval to the settlement. |
| EXCLUDE YOURSELF FROM THE SETTLEMENT | Get no money from the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Defendants about the legal claims in this case. **Current landowners avoid giving Defendants an Easement (see Questions 16 and 20).** |
| OBJECT | If you do not exclude yourself, you may write to the Court about why you don't like the Settlement. |
| GO TO A HEARING | If you object, you also may ask to speak in Court about the fairness of the Settlement. |
| DO NOTHING | Get no payment. Give up rights to ever sue the Defendants or the railroads about the legal claims in this case. **Current landowners will be subject to an Easement (see Question 16).** |

*Id.* at 41. The rest of the notice further describes the litigation, the proposed settlement, and the claims process.

Ziegler argues that notice by first-class mail did not satisfy due process, primarily because a failure to respond would result in the extinguishment of a real-property interest through an easement.[1] He argues that the constitutional adequacy of notice " 'must be judged in the light of its practical application to the affairs of men as they are ordinarily conducted,' " Aplt. Br. at 33 (quoting *Greene v. Lindsey*, 456 U.S. 444, 451, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982)), and that individuals in the ordinary course of affairs do not anticipate that the consequence of ignoring a mailing is to lose valuable real-property rights. He claims that the easement provision amounts to granting judgment on a counterclaim by Defendants, citing *Sample v. Qwest Commc'ns Co. LLC*, No. CV 10–08106–PCT–NVW, 2012 WL 1880611, at *2 (D. Ariz. May 22, 2012) (the easement provision in the proposed settlement in the Arizona counterpart to this litigation "is the effective equivalent of adjudicating a counterclaim by Defendants against the settling class members for easements on the class members' properties"); and he contends that counterclaims against class-action plaintiffs are improper, citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("[A]bsent plaintiff class members ... are almost never subject to counterclaims or cross-claims...."). He also characterizes the easement provision in the settlement as effecting an inverse condemnation, and suggests that the class members were entitled to at least the personal service allegedly required in New Mexico for inverse-condemnation actions.

We are not persuaded. To put the matter in perspective, the structure of the settlement (if not the precise amounts of compensation) is precisely what one would expect as a resolution of the claims in the

---

1. Ziegler also argues that Defendants' use of the rights-of way for fiber-optic purposes is a constitutionally improper uncompensated taking. But he did not raise this theory before the district court, so we decline to address it. *See Crow v. Shalala*, 40 F.3d 323, 324 (10th Cir. 1994).

complaint—without any counterclaim. If Defendants are going to pay anything to the class members, they would insist on a release, a release that would protect them against repeated litigation over the same subject matter. And the best protection against litigation by future owners of the land is an easement that can be recorded, making it readily enforceable. Indeed, even if the class members went to trial and prevailed on all their claims, one would expect a similar resolution in the end. Although the class complaint demands removal of the fiber-optic cable, it would be remarkable if the class members had any interest in the removal, given that the rights-of-way are generally inaccessible to them in any event. Rather than seeking removal of the cable, they would surely prefer compensation for future intrusion (that is, compensation for an easement).

With this in mind, we can see that the easement provision in the settlement agreement is hardly a special feature requiring special notice. Ziegler does not suggest that any other provision, or the other provisions altogether, make this a qualitatively unique settlement requiring greater notice than in other class-action settlements. Yet the easement provision adds nothing to what is already in the settlement agreement that limits how a class member could use the property. Apart from the easement provision, the settlement calls for class members to agree that neither they nor their successors-in-interest may bring any past, present, or future claims against Defendants or the railroads relating to the rights-of-way or the fiber-optic cable. Ziegler has not, nor could he, contend that a class member would have any greater rights against Defendants or the railroads in the absence of the easement. Theoretically, the class member might get a better price through a sale of his property if it were not burdened by an easement; but the settlement agreement purports to bind successors-in-inter-

est (so getting the higher sale price might require improper nondisclosure to a potential buyer), and we doubt that the easement would have a material effect on the sale price in any event. We note that easements have regularly been approved in fiber-optic-cable class-action litigation. *See Uhl,* 309 F.3d at 982; *In re WorldCom, Inc.,* 347 B.R. at 135–36, 155; *AT & T Corp. v. City of Toledo,* 351 F.Supp.2d 744, 746 (N.D. Ohio 2005). Such·provisions are not impermissible, particularly where, as here, they involve land that is already seriously encumbered.

We therefore examine the notice in this case to determine whether it would suffice under the usual requirements for notice to class members. We think it does.

The Supreme Court has consistently endorsed notice by first-class mail. In 1985 it held that "a fully descriptive notice ... sent first-class mail to each class member, with an explanation of the right to 'opt out,' satisfies due process." *Phillips Petroleum,* 472 U.S. at 812, 105 S.Ct. 2965; *see Greene,* 456 U.S. at 455, 102 S.Ct. 1874 ("Particularly where the subject matter of the action also happens to be the mailing address of the defendant, ... notice by mail may reasonably be relied upon to provide interested persons with actual notice of judicial proceedings."); *Mullane,* 339 U.S. at 319, 70 S.Ct. 652 ("[T]he mails today are recognized as an ·efficient and inexpensive means of communication.").

Ziegler argues, however, that the inadequacies of the notice surely resulted in unknowing forfeitures of rights by landowners because its recipients were likely to mistake the notice as junk mail and ignore it. He suggests in a footnote (without having preserved the issue in district court) that certified mail, rather than first-class mail, might cure the alleged federal due-process deficiency, and that even certified mail would not satisfy New Mexico

law. We appreciate that the deluge of junk mail with misleading envelope announcements will diminish the impact of proper legal notifications by mail. But due process does not require protection of those who are uncommonly inattentive. *See In re Charles Schwab Corp. Sec. Litig.*, No. C 08–1510 WHA, 2010 WL 2178937, at *1 (N.D. Cal. May 27, 2010) (finding no "excusable neglect" where "[t]he only excuse provided by the [class members] for not reading the notice is that the notice had been relegated to a pile of 'junk mail' "). In 1981 a court was urged to find notice by first-class mail inadequate because "in this day of proliferating junk mail, class members may simply disregard a first class letter, but would be more inclined to pay careful attention to a certified letter." *Cayuga Indian Nation v. Carey*, 89 F.R.D. 627, 632 (N.D.N.Y. 1981). The court responded that "plaintiffs should [not] be burdened with the substantially greater costs of a certified mailing to the thousands of class members solely on the basis of one defendant's speculation concerning human behavior." *Id.* Other courts have also rejected the argument that class-action notices must be sent by certified mail rather than first-class mail. *See Wolfert ex rel. Estate of Wolfert v. Transamerica Home First, Inc.*, 439 F.3d 165, 175–76 (2d Cir. 2006); *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 91 (3d Cir. 1985) ("[T]he only decision we have found that even discusses the relative merits of first-class and certified mail in the notice context expressly reaffirms the adequacy of first-class mail.").

Here, only the most inattentive (who tune out all unfamiliar mail without examination) would miss the importance of the mailed notice. The mailing envelope clearly indicates that it contains a *"COURT-OR-DERED LEGAL NOTICE"* and also states in red typeface that it is an "IMPORTANT NOTICE ABOUT YOUR PROPERTY." Notice, Aplee. Supp. App.

at 39. Courts have held that notices featuring similar elements are unlikely to be discarded as trash. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1202 n.20 (11th Cir. 1985) (endorsing "using a bold-type notice on the envelope in which the class notice is mailed, identifying it as a legal notice" to distinguish a notice from junk mail); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 533 (D.N.J. 1997) ("Additionally, the clear title of the Class Notice: 'OFFICIAL NOTICE FROM THE UNITED STATES DISTRICT COURT' reasonably alerts recipients of the importance of the contents, diminishing the likelihood that the notice would be tossed as junk mail.").

First-class mail sufficed to give notice.

### B. Fairness

A district court may approve a proposed settlement only after "finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The fairness inquiry considers:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002). *But cf.* Proposed Fed. R. Civ. P. 23 advisory committee's note to 2016 proposed rules, subdivision (e)(2) (cautioning against focusing on lengthy list of factors and losing sight of central concerns). Our review of the district court's approval of the settlement is for abuse of discretion, which in-

cludes review of factual findings for clear error. *See Rutter & Wilbanks* at 1186–87.

■ The district court found each factor to favor approval of the settlement. First, the court found "that the settlement was fairly and honestly negotiated," noting that "Ziegler points to no evidence of collusion, and the evidence that is before the Court supports the inference that the parties extensively negotiated the settlement at arm's length." Order at 7. Next, it found that the outcome of the litigation would be highly uncertain because it hinged on complex issues concerning the railroads' property rights, the statute of limitations, continuing-trespass theory, and the measure of damages. *See id.* "Rulings adverse to [class members] on any of these issues," wrote the court, "would have either greatly reduced, or eliminated altogether, class members' chances for recovering anything in this litigation." *Id.* Turning to the third factor, the court found that class members would receive "meaningful cash compensation" and ceded to Defendants "substantially more limited rights" than Defendants might have won in litigation, and accordingly found that the value of the settlement "far outweigh[ed] the mere possibility of future relief after yet further litigation." *Id.* at 7–8. Finally, the court found that the judgment of the parties, the mediator, and the 43 other courts to approve similar settlements, as well as the dearth of opposition—only a few class members opted out and Ziegler filed the only objection—implied that the settlement is fair. *See Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 118 (2d Cir. 2005) ("'If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.'" (quoting H. Newberg & A. Conte, 4 Newberg on Class Actions § 11.41, at 108 (4th ed. 2002))). We see no clear error in these findings.

Ziegler does not challenge the district court's specific findings or identify any of the four *Rutter* factors as militating against approval. Rather, he argues that the settling parties clearly intended to minimize compensation paid to class members and to maximize the number of easements obtained by Defendants without compensation, as evidenced by the following elements of the settlement: (1) it releases claims against the (nonparty) railroads; (2) it releases the claims of class members who do not receive compensation (such as those not submitting a valid claim); (3) the cumbersome nature of the claim form discourages claims; (4) the settlement perversely incentivizes counsel to construct a claims procedure that will minimize successful claims because Defendants receive a refund from the claims administrator for any excess of their contributions to the settlement account above the total payments to class members; and (5) class counsel will reap most of the aggregate recovery.

The district court overruled the first three of these arguments. We see no error. First, it is not improper for a class-action settlement to release claims against nonparties. "[C]lass action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Wal–Mart,* 396 F.3d at 109 (internal quotation marks omitted). Prior fiber-optic-cable settlements have released claims against the railroads. *See, e.g., In re WorldCom, Inc.,* 347 B.R. at 156 (following *Wal–Mart*). Such a release is appropriate here. If the railroads are not released, they might later be sued for trespass, and might in that case seek indemnification from Defendants. The releases foreclose this possibility and thus ensure the final resolution so critical to Defendants' agreeing to settle.

Further, because the easements will have already been conveyed (precluding any future trespass claims), and because the class will have already been fairly compensated for the alleged past trespasses, we see no additional recovery that a landowner could expect to obtain from the railroads.

Second, inherent in the nature of a class-action settlement is the release of the claims of every class member (except those who opt out). On appeal Ziegler asserts that class members should not have to submit a claim form to receive compensation, but he did not raise this argument below. In any event, it makes perfect sense to require class members to submit a claim form evidencing their entitlement to compensation. *See Manual for Complex Litigation (Fourth)* § 21.66 at 331 (2004) ("Class members must usually file claim forms providing details about their claims and other information needed to administer the settlement.").

Third, Ziegler did not adequately raise in district court any complaint that the claims procedure is cumbersome and will discourage claims. At the fairness hearing he complained only of the requirement that claimants owning more than 350 linear feet of right-of-way must submit a land patent to receive compensation. When questioned by the court on this provision, class counsel explained that most patents are freely available on the Bureau of Land Management website, and that class members may also enlist a third party to obtain the patent, paying a $22 or $25 fee only if the claim succeeds in obtaining a greater amount. The court was satisfied with this explanation, and so are we.

Ziegler's final two challenges on appeal relate to attorney compensation. Under the settlement agreement all unclaimed compensation reverts to Defendants, and Defendants will pay class counsel a fixed fee independent of the amount recovered by the class. Ziegler argues that these clauses operate together to the detriment of class members: the reversion clause creates an incentive for Defendants to design a claims procedure that minimizes successful claims, and class counsel, their fee assured and untethered to the amount of class recovery, lack incentive to zealously oppose such a design. Ziegler urges that the district court's measure of the reasonableness of the fee was blind to this interplay and failed to perceive that the attorneys will likely reap about 70% of the total recovery.

The court used a "percentage-of-fund" approach, which measures the proposed fee award against the total settlement fund, defined as the sum of administrative costs (here, $934,000), the proposed fee award ($1,347,000), and the aggregate class recovery if every class member submits a successful claim ($2,501,000). The court divided the proposed fee ($1,347,000) by the total fund amount ($4,782,000) to reach 28%, and found that percentage reasonable. The court also found the fee award "amply supported by a lodestar crosscheck" in that class counsel had incurred overall (nationwide) fees and expenses of $60 million, but sought only $41.5 million in fees. *See* Fee Order, Aplt. App., Vol. 3 at 596–97 ¶¶ 11–12.

In challenging the fee, Ziegler relies on *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014). *Pearson* urged courts to measure attorney fees against only the actual compensation paid to class members. *See id.* at 780–81. The ratio that matters "is the ratio of (1) the fee to (2) the fee plus what the class members received." *Id.* at 781 (internal quotation marks omitted). The court continued:

> Basing the award of attorneys' fees on this ratio, which shows how the aggregate value of the settlement is being split between class counsel and the class, gives class counsel an incentive to design

the claims process in such a way as will maximize the settlement benefits actually received by the class, rather than to connive with the defendant in formulating claims-filing procedures that discourage filing and so reduce the benefit to the class.

*Id.* We see merit in an approach that ties attorney recovery to the amount actually paid to the class. Applying it here, assuming a 25% claim rate (as estimated by class counsel at the fairness hearing), and further assuming that every claim is successful, the total award to class members would be 25% of $2,501,000, or $625,250. The attorney fee of $1,347,000 would represent more than double the amount paid to the class and constitute 68% of the total fund.

Ziegler did not, however, present these arguments to the district court, so we will not reverse on this ground. *See Crow*, 40 F.3d at 324. We also note that Ziegler expressly waived any argument that the compensation to class members was inadequate: "I do believe that the compensation is unfair, but I will waive any argument as to that effect—as to that issue." Fairness Hr'g Tr. at 81:24–82:1, Aplee. Supp. App. at 24–25.

### III. CONCLUSION

We AFFIRM the district court's final approval of the settlement agreement.