**TBK PARTNERS, LTD., et al.,**
**Plaintiffs-Appellees,**

v.

**WESTERN UNION CORPORATION, et al., Defendants-Appellees.**

**Frances D. Spier, et al.,**
**Objectors-Appellants.**

**No. 375, Docket 81-7523.**

United States Court of Appeals, Second Circuit.

Argued Nov. 19, 1981.

Decided March 18, 1982.

J.App. at 138a–39a.

Edward J. Walsh, Jr., New York City (Morris Shilensky, Russell Ann Nobles, Edward F. Campbell, Jr., and Hays, St. John, Abramson & Heilbron, New York City, on the brief), for objectors-appellants.

Burton L. Knapp, New York City (Neil L. Selinger, and Lowey, Dannenberg & Knapp, New York City, on the brief), for plaintiffs-appellees.

Herbert M. Wachtell, New York City (Steven M. Barna, Theodore N. Mirvis, and Wachtell, Lipton, Rosen & Katz, New York City, on the brief), for defendants-appellees.

Before MANSFIELD and NEWMAN, Circuit Judges.*

NEWMAN, Circuit Judge:

This is an appeal from a judgment of the District Court for the Southern District of New York (Milton Pollack, Judge), approving the settlement of a consolidated shareholder class and derivative action involving a dispute over a century-old lease. In 1882, the Gold and Stock Telegraph Company ("Gold & Stock") leased its entire private telegraph business to the Western Union Telegraph Company ("Western Union") for a period of 99 years in return for annual payments to Gold & Stock's shareholders. Over the years, Western Union acquired 95.3% of Gold & Stock's 50,000 shares. Those minority shareholders who object to the settlement and who are appellants here contend that upon the expiration of the lease, Gold & Stock shareholders were entitled to Western Union's 1981 business, worth $17,000 per share of Gold & Stock. Pursuant to a proposed short-form merger between Western Union and Gold & Stock,

---

* With the consent of the parties, this appeal was heard by a panel of two judges, following the recusal of a third judge.

Western Union had valued Gold & Stock shares at $256.97. The settlement increased this value by $126.53 to $383.50 per share. The objectors contend that the District Court erred in approving the settlement because (1) it enjoins class members from prosecuting claims that were not part of the class action and (2) the opposition of more than half of the class of minority shareholders to the settlement demonstrates its unfairness. We find neither reason persuasive and affirm the District Court's approval of the settlement.

Under the lease, Western Union acceded to 1881-vintage poles, wires, insulation, printers, transmitters, battery cells, magnets, call bells, registers, switches, and the like, as well as the rights to Gold & Stock's franchises, easements, patents, and shares of stock of other telegraph companies. Over the years, the operating assets outlived their usefulness, and the business lost its separate identity as Western Union's modern telecommunications business developed. The lease made no provision as to what interest, if any, was to revert to Gold & Stock upon its expiration. Under appellants' view of the lease, in light of Western Union's failure to preserve the operating identity of Gold & Stock, the proper result upon expiration of the lease should have been distribution of all the assets of Western Union among the Gold & Stock shareholders as a reversionary interest.

In July 1980, a class action suit was commenced by TBK Partners Ltd. ("TBK Partners") on behalf of a class of all Gold & Stock minority shareholders. The complaint alleged that Gold & Stock was an investment company under the Investment Company Act of 1940, 15 U.S.C. § 80a (1976), and that Western Union had violated the Act by not registering it as such and by causing it to engage in transactions prohibited by the Act without the approval of the SEC. The complaint further alleged in a pendent state law claim that Western Union had breached fiduciary duties owed to the minority shareholders by wrongfully commingling Gold & Stock's assets with Western Union's. The complaint requested, among other things, an injunction against any merger between Western Union and Gold & Stock.

In late 1980, after the District Court as well as a New York state court had denied requests for preliminary injunctive relief, Western Union, as the owner of more than 95% of Gold & Stock's shares, proposed to effect a short-form merger of Gold & Stock into Western Union pursuant to N.Y.Bus. Corp.Law § 905 (McKinney 1963). Western Union determined that the fair value per share payable in the merger would be $256.97, calculated as follows:

(1) $423,203 or $8.46/share for the aggregate value of assets transferred to Western Union;

(2) $12,200,246 or $244.01/share for net proceeds from the disposition of stock assets transferred to Western Union under the lease;

(3) $150,000 or $3.00/share for the stock assets still in the possession of Western Union; and

(4) $1.50/share for the final quarterly payment due Gold & Stock under the lease.

Plaintiff TBK Partners was granted leave to assert additional claims related to the proposed merger. The new claims included allegations that (1) the Information Statement sent to Gold & Stock shareholders at the time of the proposed merger misstated or omitted material facts regarding the value of the reversionary interest under the lease in violation of the federal securities laws, (2) Western Union would violate a fiduciary duty owed to Gold & Stock by effecting the merger while undervaluing Gold & Stock's reversionary interest, and (3) the merger would violate the lease by depriving Gold & Stock shareholders of their right to the full value of the reversionary interest.[1] The District Court

---

1. A derivative suit alleging similar claims on behalf of Gold & Stock was filed in the Southern District of New York by another Gold & Stock shareholder, Julius Garfield. The District Court consolidated the class action suit brought by TBK Partners and the derivative

certified the action as a class action pursuant to Fed.R.Civ.P. 23(a), 23(b)(1)(A), 23(b)(1)(B), and 23(b)(2) "on behalf of a class consisting of all owners of Capital Stock of [Gold & Stock other than Western Union] as of July 3, 1980." The Notice of Pendency of the class action informed all owners of Gold & Stock capital stock that:

> All persons who fall within the definition of the class are automatically members of the class. Any judgment or other disposition of the Action will include and be binding upon all members of the class, whether or not favorable to the class. If there is a decision adverse to the class, members of the class . . . would be subject to the contention that they are barred from asserting any claim arising out of or connected with the claims asserted in the Action.

Upon the approval of the New York Public Service Commission, the merger took effect on December 30, 1980.

As provided for by New York law, many of the objectors chose to dissent from the merger price offered by Western Union and they accordingly commenced an appraisal proceeding in state court to determine the fair value of their Gold & Stock shares. N.Y.Bus.Corp.Law § 623 (McKinney 1963). That action was dismissed without prejudice by the state court because it involved "essentially the same issues" as the federal court action.

TBK Partners and Western Union then reached a settlement of the federal suit. Under the terms of the settlement, Western Union agreed to pay $383.50 per outstanding share of Gold & Stock stock, an increase of $126.53 over the price it had originally offered to pay for each share. The increase

represented in effect an increase of over $6,000,000 in the valuation of the reversionary interest, which had been previously valued at less than $13,000,000. The settlement released Western Union from all claims that might be asserted in connection with the action and enjoined all class members from prosecuting such claims, including the appraisal proceeding that had been dismissed without prejudice by the state court. The settlement was binding on all class members; class members could not opt out of the settlement. The terms of the settlement were fully set forth in the Notice of Settlement and Settlement Hearing mailed to each class member.

The District Court then, with the benefit of a full record of the history of the controverted lease, held a settlement hearing to consider the objectors' claims. Fed.R.Civ.P. 23(e), 23.1. After carefully considering the provisions of the lease as they related to each claim of the objectors, the District Court found that the proponents of the settlement had met their burden of showing the settlement to be "fair, reasonable and adequate, negotiated at arm's length, and reached in good faith and in the considered judgment of those fully aware of the factors and the strengths and weaknesses in the litigation." In light of the sizable risks to the class from the "complex, costly and protracted litigation" that would otherwise result, the District Court found the settlement to be reasonable. 517 F.Supp. 380.

## I.

■ The objectors first contend that the District Court erred in approving a settlement that barred class members from pursuing appraisal proceedings in state court.[2]

---

suit brought by Garfield. The objectors contend that there was a lack of diversity of citizenship in the *Garfield* action that would have deprived the District Court of jurisdiction. Because we clearly have jurisdiction over the consolidated suit now before us, which alleges nonfrivolous claims under the federal securities laws in addition to the pendent state law claims, we do not need to reach this contention.

**2.** In a related argument, the objectors contend that those objectors who took the necessary

steps to secure their appraisal rights are not members of the class. They suggest that under N.Y.Bus.Corp.Law § 623 (McKinney 1963) the shareholders electing to assert their appraisal right surrendered in exchange all other rights including their status as shareholders of Gold & Stock and their right to a full share of the settlement fund. We disagree. These objectors are clearly within the defined class of "all owners of Capital Stock of The Gold & Stock Telegraph Company (other than defendants) as of July 3, 1980, the date of the commencement

They suggest that a federal court approving a settlement of a class action lacks the power to bar claims that were not and could not have been asserted in the class action. A claim for appraisal, they contend, could not have been asserted on behalf of the class because (1) appraisal rights are individual statutory rights personal to class members that are inappropriate for adjudication in a class action and had not matured by the time the class action was commenced and (2) the New York State Supreme Court has exclusive jurisdiction over appraisal proceedings.

We do not need to determine whether objectors are correct that an appraisal claim as such could not have been part of the class action.[3] As long as the overall settlement is found to be fair and class members were given sufficient notice and opportunity to object to the fairness of the release,[4] we see no reason why the judgment upon settlement cannot bar a claim that would have to be based on the identical factual predicate as that underlying the claims in the settled class action. We have previously "assume[d] that a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts." *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9, 18 n.7 (2d Cir. 1981). In *Robertson*

*v. National Basketball Ass'n*, 622 F.2d 34 (2d Cir. 1980), we approved a settlement that barred a class member from pursuing an individual claim based on a variation of the antitrust theory presented in the class action because both suits hinged on the same operative factual predicate—the concept of the NBA's compensation rule. *Id.* at 35. And we have recognized the authority of a state court to approve a settlement that releases a claim within the exclusive jurisdiction of the federal courts. *Abramson v. Pennwood Investment Corp.*, 392 F.2d 759, 762 (2d Cir. 1968). *See also Saylor v. Lindsley*, 391 F.2d 965, 969 n.6 (2d Cir. 1968); *Bernstein v. Mediobanca Banca di Credito Finanziario-Societa Per Azioni*, 78 F.R.D. 1 (S.D.N.Y.1978). We therefore conclude that in order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.

Here both the class action and the state appraisal proceeding hinge on the identical operative factual predicate: the correct valuation of whatever reversionary interest was owed to Gold & Stock's shareholders. The gravamen of all the class claims of breach of the lease, breach of a fiduciary

---

of this action" and are entitled to full shares in the Settlement Fund.

3. N.Y.Bus.Corp.Law § 623(h) (McKinney 1963), which confers on the Supreme Court for the judicial district in which the corporation's offices are located "exclusive" jurisdiction over an appraisal proceeding, was viewed by the District Court as "a venue provision designed to put an appraisal proceeding in one and only one judicial district." We agree with the District Court that there would be substantial doubt as to the constitutionality of a state law purporting to preclude federal court diversity or pendent jurisdiction over a state-created claim. "Whenever a general rule as to property or personal rights, or injuries to either, is established by State legislation, its enforcement by a Federal court in a case between proper parties is a matter of course, and the jurisdiction of the court, in such case, is not subject to

State limitation." *Railway Co. v. Whitton's Administrator*, 80 U.S. (13 Wall.) 270, 286, 20 L.Ed. 571 (1872). That rule does not require a federal diversity court to exercise its jurisdiction if the courts of the forum state would not interfere in a dispute properly cognizable in a foreign forum. *Weiss v. Routh*, 149 F.2d 193, 195–96 (2d Cir. 1945) (district court should follow New York law and exercise discretion not to hear appraisal claim brought under Virginia law).

4. Objectors have never and do not now challenge the District Court's certification of the class as a non-opt-out class under Rules 23(b)(1) and (2). We therefore do not consider the case of a release of claims of members of a class that had been improperly certified as a non-opt-out class.

duty owed to Gold & Stock, and material misstatements in the Information Statement is Western Union's alleged undervaluation of the reversionary interest.[5] The class action settled the valuation of the reversionary interest, and that valuation would lie at the heart of an appraisal proceeding. Moreover, all class members were warned that "members of the class ... would be subject to the contention that they are barred from asserting any claim arising out of or connected with the claims asserted in the Action." It would be hard to imagine a claim that would be more tightly connected to those asserted in the class action than a claim in an appraisal proceeding that Western Union had undervalued the reversionary interest due Gold & Stock, which was for all practical purposes a corporate shell having no value other than the value of the reversionary interest to be returned at the end of the lease. Objectors were fairly apprised and should have been able to anticipate, *see The Evergreens v. Nunan,* 141 F.2d 927, 929 (2d Cir.), *cert. denied,* 323 U.S. 720, 65 S.Ct. 49, 89 L.Ed. 579 (1944), that the class action would adjudicate the value of the reversionary interest. Fed.R.Civ.P. 23(c)(2); *cf. Marshall v. Kirkland,* 602 F.2d 1282, 1298 n.12 (8th Cir. 1979); *Johnson v. General Motors Corp.,* 598 F.2d 432, 436–37 (5th Cir. 1979). The objectors were also fully informed of the terms of the settlement and given a full opportunity to object to its provision for release of the appraisal claim.

Courts should no doubt be cautious about permitting issue preclusion in the context of a settlement of a class action.

> [A]pproval of a settlement does not call for findings of fact regarding the claims to be compromised. The court is concerned only with the *likelihood* of success or failure; the actual merits of the controversy are not to be determined. The

evidence is limited accordingly. The rules of evidence are relaxed. The court listens to the advice and wishes of interested parties. This is not the procedural stuff from which binding determinations of fact can be drawn.

Haudek, *The Settlement and Dismissal of Stockholders' Actions—Part II: The Settlement,* 23 Sw.L.J. 765, 809 (1969) (footnotes omitted). Nonetheless where there is a realistic identity of issues between the settled class action and the subsequent suit, and where the relationship between the suits is at the time of the class action foreseeably obvious to notified class members, the situation is analogous to the barring of claims that could have been asserted in the class action. Under such circumstances the paramount policy of encouraging settlements takes precedence.

We recognize, however, that in fulfilling the court's responsibility to scrutinize the fairness of a class action as required by Fed.R.Civ.P. 23(e), special care must be taken to ensure that the release of a claim not asserted within a class action or not shared alike by all class members does not represent an "advantage to the class ... by the uncompensated sacrifice of claims of members, whether few or many." *National Super Spuds, Inc. v. New York Mercantile Exchange, supra,* 660 F.2d at 19. In *National Super Spuds,* a class action was brought on behalf of all persons who purchased potato futures contracts on the Exchange that were liquidated between April 13, 1976 and May 7, 1976. Objector Richards was a member of this class, but he also brought a separate state court class action regarding incomplete deliveries pursuant to unliquidated potato futures contracts bought after May 7, 1976. Although the notice of pendency of the federal class action and the notice of settlement made no mention of the claims on the unliquidated

---

5. To the extent that claims in the class action (such as Western Union's alleged violation of the lease provision requiring it to maintain the separate corporate existence of Gold & Stock for the full term of the lease) might have resulted in recoveries beyond the value placed on the reversionary interest, the settlement recovery might actually exceed the fair value of the reversionary interest. But it is certain that if the settlement is a fair valuation of the claims in the class action, the fair value of the reversionary interest and of the Gold & Stock shares cannot exceed the settlement amount.

contracts that were the subject of the state action, the settlement extinguished the claims on the unliquidated as well as the liquidated contracts and did so in exchange for settlement shares determined solely on the basis of the liquidated contracts owned. We refused to affirm the District Court's approval of a settlement that would release distinct claims that not only "depend[ed] . . . upon a different legal theory but upon proof of further facts, namely, the holding of unliquidated contracts after May 7, wrongful default on those contracts, and the damages caused by the default." *Id.* at 18 n.7. We declined to permit the uncompensated release of claims resting on a separate factual predicate from that settled in the class action. "If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." *Id.* at 18.

At the heart of our concern was the danger that a class representative not sharing common interests with other class members would "endeavor[ ] to obtain a better settlement by sacrificing the claims of others at no cost to" himself by throwing the others' claims "to the winds." *Id.* at 19 n.10, 17 n.6. There would be no assurance that the class representative had fully advanced the unshared claims of the class members. *Id.* at 17 n.6. But these concerns are not implicated where the released claim rests on the same factual predicate as the class action claim. Here all class members had the same interest in maximizing the value placed on Gold & Stock's reversionary interest, and the settlement treats all class members identically.[6] Whether payment results from a breach of fiduciary duty, a breach of the lease, or from an appraisal proceeding, the same facts support (or limit) the amount of recovery for the value of the reversionary interest. We conclude that the District Court exercised the extra vigilance required to ensure that a settlement's release of a claim not asserted in the class action does not unfairly disadvantage individual class members.

## II.

The objectors also contend that the District Court erred in finding the settlement to be fair, reasonable, and adequate. They emphasize that the holders of between 54% and 58% of the outstanding shares of Gold & Stock held by the class of minority shareholders oppose the settlement, and they complain that the settlement does not include any value for the return of a business to Gold & Stock.

■ A settlement can, of course, be fair notwithstanding a large number of objectors. *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (approving settlement over objections of counsel purporting to represent almost 50% of class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799 (3d Cir.) (approving settlement over objections of 20% of class), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed. 146 (1974). But although majority rule should not necessarily be a litmus test for the fairness of a proposed settlement, the opposition to a settlement by a majority of a class is significant. *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1216–17 (5th Cir. 1978) (disapproving settlement opposed by 70% of subclass), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Especially when a dispute centers on the sufficiency of a settlement fund rather than the allocation of a fund, majority opposition to a settlement tends to indicate that the settlement may not be adequate since class members presumably know what is in their own best interests. Nevertheless, majority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risks of litigation, determines to be manifestly reasonable. Preventing settlement in such circumstances not only deprives other class members of the benefits of a manifestly fair settlement and subjects them to the uncertainties of litigation, but, in this case, would

---

**6.** In fact, TBK Partners, the class representative, itself elected to pursue the appraisal reme- dy that was not formally part of the class action.

most likely have resulted in the eventual disappointment of the objecting class members as well.[7]

The factors that need to be considered in assessing the reasonableness of a proposed settlement of a class action have been canvassed at length elsewhere and need not be repeated here. *See, e.g., Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982); *In re Traffic Executive Ass'n*, 627 F.2d 631 (2d Cir. 1980); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *Newman v. Stein*, 464 F.2d 689 (2d Cir.), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972). It is well settled that great weight must be accorded the views of the trial judge because exposure to the litigants and their strategies makes him uniquely aware of the strengths and weaknesses of the case and the risks of continued litigation. This Court will not overturn a district court's approval of a settlement absent a clear showing of an abuse of discretion. *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 454–55. Suffice it to say that, without "reach[ing] any dispositive conclusions on the admittedly unsettled legal issues," *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079, 1086 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), we are fully satisfied that Judge Pollack acted well within his discretion in finding the settlement to be manifestly reasonable.

■ The District Court approved the settlement only after giving comprehensive consideration to all relevant factors and listening carefully to each contention of the objectors. The parties as well as the District Court had available a substantial evidentiary record facilitated by a document depository made available by Western Union. And the litigation was sufficiently advanced to permit the District Court to assess the likelihood and amount of any successful recovery upon a trial balanced against the amount offered in the settle-

ment. There was every indication that the settlement negotiations had been conducted at arm's length by experienced, adversarial counsel and that the settlement had been reached in good faith. We find no basis to question the District Court's conclusion that "[i]f this case is not settled it is likely (indeed certain) that complex, costly and protracted litigation would result ... in which the class bears an extremely high risk" of recovering less than that offered by Western Union in the settlement.

The objectors claim that the settlement does not include any significant value for the return of a business to Gold & Stock. Because they believe that the return of a business at the end of the term of the lease was clearly contemplated, they contend that the settlement is unfair. Even if the objectors are correct that the claim for return of a business at the end of the lease has some value, the settlement did not fail to recognize such value. The settlement added $6,000,000 to the fund for all shareholders (including Western Union's 95.3% holding). The objectors argue that this amount reflects only an additional recovery for Gold & Stock stock assets disposed of by Western Union. The actual value of these stock assets, however, was controverted below. Therefore, the $6,000,000 cannot be deemed to be attributable solely to Western Union's obligation with regard to the stock assets, but represents at least in part an additional recovery, on top of the $423,203 originally offered in Western Union's proposed merger price, for the value of business assets that allegedly would have reverted to Gold & Stock at the end of the lease.

As to the adequacy of the amount to be recovered for business assets under the settlement, we note that "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed

---

7. Objectors suggest that even a manifestly reasonable settlement cannot be approved over the objection of a majority-in-interest of a non-opt-out class. But the District Court's certification of the class as a non-opt-out class under Rules 23(b)(1) and (2) is not and never was challenged, and we do not pass on the correctness of that certification. Although relevant, the non-opt-out nature of a class does not give a majority-in-interest an absolute veto of any settlement.

settlement" is inadequate; there is no reason "why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 455 & n.2. Like Judge Pollack, we attach little significance to the objector's claim for $17,000 per share of Gold & Stock stock. We find the claim that Gold & Stock is entitled to all of the modern telecommunications business of Western Union patently unreasonable and believe that there was no chance of success for such a recovery. The most that Gold & Stock might, under the circumstances, be entitled to as a reversionary interest under the lease would be a percentage of Western Union's current value reflecting the portion of Western Union's business in 1881 attributable to Gold & Stock's contribution.[8] The evidence indicates that in 1881 Gold & Stock's size and profitability was minute in comparison to Western Union's. Even this possibility must be tempered by the substantial risk that the District Court would find after a trial on the merits that Gold & Stock was entitled to no reversionary interest in business assets under the 99-year lease, which contained no mention of a reversionary obligation and might be interpreted to have been a permanent transfer of property, much of which consisted of 1881-vintage equipment that foreseeably would be obsolete 99 years later. We recognize that Western Union has historically admitted the existence of some reversionary obligation,[9] but in light of the substantial risks inherent in further litigation and the limited potential amount of a possible successful recovery, we find no reason to overturn the District Court's evaluation of the settlement as manifestly reasonable.

Judgment affirmed.

8. No severable part of Western Union's present day communications business can be traced to the contribution of Gold & Stock. Under the lease, Western Union was authorized to manage and operate Gold & Stock's property "in such manner as may be deemed expedient by [Western Union]," and was granted "full right and authority to use, operate and enjoy the same and all and every part thereof as fully as [Gold & Stock] might have."

9. The objectors rely on prior litigation construing the lease to support their contentions. *E.g., Gold & Stock Telegraph Co. v. Commissioner,* 83 F.2d 465 (2d Cir.), *cert. denied,* 299 U.S. 564, 57 S.Ct. 26, 81 L.Ed. 415 (1936); *Johnson v.* *Western Union Telegraph Co.,* Index No. 30748–1942 (N.Y.Sup.Ct.N.Y.County Mar. 17, 1943), *aff'd without opinion,* 267 A.D. 757, 45 N.Y.S.2d 927 (1st Dep't 1943), *rev'd in part,* 293 N.Y. 379, 57 N.E.2d 721 (1944), *on remand,* 184 Misc. 728, 53 N.Y.S.2d 867 (N.Y.Sup.Ct.N.Y. County 1945); *Smith v. Western Union Telegraph Co.,* 276 A.D. 210, 93 N.Y.S.2d 653 (1st Dep't 1949), *aff'd without opinion,* 302 N.Y. 683, 98 N.E.2d 482 (1951); *In re Johnson,* Index No. 797–57 (N.Y.Sup.Ct.N.Y.County May 23, 1957) (settled by stipulation). We do not find anything in these cases that is dispositive of the issues in this litigation.