**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ELNA SEFCOVIC, LLC; WHITE RIVER
ROYALTIES, LLC; JUHAN, LP; ROY
ROYALTY, INC., individually and on
behalf of all others similarly situated,

     Plaintiffs - Appellees,

v.

TEP ROCKY MOUNTAIN, LLC,

     Defendant - Appellee.

------------------------------

CHARLES DEAN GONZALES;
SUSANNAH GONZALES; TED L.
VAUGHAN; HILDA VAUGHAN,

     Objectors - Appellants,

IVO LINDAUER; SIDNEY LINDAUER;
RUTH LINDAUER; DIAMOND
MINERALS,

     Intervenors,

and

THE LAW OFFICES OF GEORGE A.
BARTON, PC,

     Movant - Appellee.
_____

No. 19-1120
(D.C. No. 1:17-CV-01990-MEH)
(D. Colorado)

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

This appeal challenges the district court's approval of a class settlement agreement over the objections of four class members. We discern no abuse of discretion and thus affirm the district court's decision.

## I.    BACKGROUND

Appellee-Defendant TEP Rocky Mountain LLC ("TEP") operates wells that produce natural gas in Colorado. These wells are subject to various leases or royalty agreements ("royalty instruments") under which the owners of such instruments receive a share of profits from the sale of natural gas.

In 2006, a class of plaintiffs filed suit (the "*Lindauer* litigation") in Colorado state court, alleging that TEP had underpaid royalties on various royalty instruments. In 2008, TEP and the *Lindauer* class entered into a settlement agreement (the "*Lindauer* SA") purporting to "resolve all class claims relating to past calculation of royalt[ies]" and to "establish certain rules to govern future royalty" payments. App. at 411. The *Lindauer* SA categorized members of the class into thirteen separate categories based on the specific terms of their royalty instruments, and set forth different royalty calculation methods for each category.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Approximately eight years passed, seemingly free of incident. But on July 18, 2017, Elna Sefcovic, LLC, White River Royalties, LLC, Juhan, LP, and Roy Royalty, Inc., individually and on behalf of a subset of royalty owners who were party to the *Lindauer* SA (the "*Sefcovic* class"), initiated this action against TEP in Colorado state court, alleging that TEP had calculated and paid royalties in a manner inconsistent with the *Lindauer* SA and contrary to the underlying royalty agreements. TEP removed the case to federal court on August 17, 2017, and subsequently asserted a counterclaim against the *Sefcovic* class for an offset of ad valorem taxes owing to any repayment of royalties by TEP. The parties engaged in discovery and ultimately reached a proposed class settlement (the "*Sefcovic* SA").

The *Sefcovic* SA creates four subclasses composed of four of the thirteen categories created by the *Lindauer* SA. These subclasses sort class members according to the rights their royalty instruments grant TEP with respect to deductions from royalty payments. The *Lindauer* categories that comprise the *Sefcovic* subclasses are categories two, three, five, and eleven. Category two agreements allow "deduction of transporting gas 'from the mouth of the well to the point of sale,' or 'customary transportation costs,' or 'all transportation charges.'" App. at 983. Category three agreements allow "deduction of third party transportation costs from the mouth of the well to the point of sale." *Id.* Category five agreements "[c]alculate[] royalty payments based on, for example, 'market value at the well,' 'proceeds at the well,' 'market value,' or 'proceeds.'" *Id.* And category eleven agreements "[c]alculate[] royalty payments based on 'gross proceeds.'" *Id.*

3

The *Sefcovic* subclasses, in turn, are composed as follows. Subclass 1 comprises owners of category two and category three agreements. Subclass 2 comprises owners of category five agreements. Subclass 3 comprises owners of category eleven agreements. And Subclass 4 comprises owners with agreements that were categorized as either five or eleven at the time of the *Lindauer* SA, but were not "currently . . . identified by TEP as exclusively [category five] or [category eleven]" agreements. The following table illustrates the relationship between the *Sefcovic* subclasses and the *Lindauer* categories.

| | |
|---|---|
| *Sefcovic* Subclass 1 | *Lindauer* **Category two:** instruments allowing "deduction of transporting gas 'from the mouth of the well to the point of sale,' or 'customary transportation costs,' or 'all transportation costs.'" App. at 983. <br><br> *Lindauer* **Category three:** instruments allowing deductions "of third party transportation costs from the mouth of the well to the point of sale." App. at 983. |
| *Sefcovic* Subclass 2 | *Lindauer* **Category five:** instruments that "[c]alculate[] royalty payments based on, for example, 'market value at the well,' 'proceeds at the well,' 'market value,' or 'proceeds.'" App. at 983. |
| *Sefcovic* Subclass 3 | *Lindauer* **Category eleven:** instruments that "[c]alculate[] royalty payments based on 'gross proceeds.'" App. at 983. |
| *Sefcovic* Subclass 4 | Instruments that were categorized as either *Lindauer* category five or eleven at the time of the *Lindauer* SA, but were not "currently . . . identified by TEP as exclusively [category five] or [category eleven]" agreements. App. at 292. |

The *Sefcovic* SA allocates settlement payments by subclass: Subclass 1 receives $454,845; Subclass 2 receives $5,787,732; Subclass 3 receives $1,157,145; and Subclass 4 receives $2,625,587. The settlement payment for Subclass 1 is "the equivalent of (a) 50% of all processing costs deducted from their payments since July 2016, and (b) over 40% of all fuel costs deducted from their payments since July 2011." App. at 1190.

On August 16, 2018, the district court[1] issued an order preliminarily approving the settlement and permitting notice to be mailed to the *Sefcovic* class members. On November 6, 2018, appellants Charles Gonzales, Susannah Gonzales, Ted Vaughn, and Hilda Vaughn (collectively, the "Objectors") filed various objections to approval of the proposed *Sefcovic* SA, including that the proposed settlement sacrificed the interests of certain class members, that the notice to class members was insufficient, and that the settlement's release of claims was overly broad.

The Objectors each own royalty instruments falling in category two of the *Lindauer* SA and are therefore members of Subclass 1, as defined by the *Sefcovic* SA. The *Lindauer* SA treated category two royalty instruments differently than other categories. Although the *Lindauer* SA provided compensation to category two and category three owners for disputed past deductions, it did not clarify which deductions would be permitted prospectively under category two and category three

---

[1] The *Sefcovic* class and TEP consented to the Magistrate Judge presiding over this matter. We therefore refer to the Magistrate Judge's orders as those of the district court.

5

leases. Instead, the *Lindauer* SA left the issue unresolved, declaring that "nothing herein prohibits [TEP][2] from taking any Deductions it claims it is entitled to take under the terms of [category two and category three (*i.e.*, Subclass 1)] Royalty Instruments, and nothing herein prohibits any Settlement Class Member from challenging such deductions." App. at 424. The *Sefcovic* SA resolves this dispute in TEP's favor, declaring that TEP is entitled to deduct from Subclass 1 members "a proportionate share of those members' gathering and fuel costs." App. at 1473.

On February 20, 2019, the court held a final fairness hearing on the proposed *Sefcovic* settlement.[3] The court heard extensive testimony from class members, potential class members who opted out of the settlement, accounting experts, and Objectors' counsel. Relevant here, the court also heard testimony from Susan Jerman, the owner of Subclass 1 representative White River Royalties, LLC. Ms. Jerman, who has worked in the oil and gas industry for forty years, testified that the deduction allowance provision in her category two agreement was weak as compared to the instruments in other subclasses, and thus, she believed the *Sefcovic* SA was "a fair

---

[2] The *Lindauer* SA refers to "Williams," TEP's predecessor. In 2015, TEP acquired a controlling interest in Williams, which had at times operated under the name WPX. Following the parties' lead, we refer to WPX when discussing events that occurred before TEP's acquisition of that entity.

[3] In the months between preliminary approval of the settlement agreement and the final fairness hearing, the class representatives of the *Lindauer* class intervened in this litigation to seek dismissal of the action for lack of subject matter jurisdiction. The district court ultimately rejected that attempt, which decision forms the basis of a separate appeal (Case No. 19-1121) heard by the same panel and resolved by a separate Opinion issued concurrently with this Order and Judgment.

settlement." App. at 1597. Having "read and considered all submissions in connection" with the *Sefcovic* SA, the district court approved the settlement and incorporated its terms into the court's final order. App. at 1461.

This timely appeal followed.

## II.    DISCUSSION

Objectors assert on appeal that (1) the settlement is not fair; (2) Subclass 1 representatives did not adequately represent the rights of absent Subclass 1 members; (3) notice of the class settlement was inadequate; and (4) the settlement agreement's release of claims is too broad.[4] We analyze each matter in turn and conclude that (1) the district court did not exceed its discretion in deeming the settlement fair;

---

[4] Objectors also seek reversal on grounds that the district court failed to conduct a "rigorous analysis" of their objections before approving the *Sefcovic* SA. But as Objectors conceded at oral argument, the "rigorous analysis" requirement refers to a district court's obligation when asked to certify a class under Rule 23(a). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (explaining that "certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Setting aside their inapposite reference to the "rigorous analysis" requirement, we understand Objectors to argue that the district court (1) failed to ask sufficiently probing questions of witnesses at the fairness hearing, and (2) failed to adequately address their objections in its order approving the settlement. But our review of the lengthy fairness hearing transcript reveals the district court was fully engaged and understood its role in protecting the interests of absent class members. And we see no deficiency in the district court's order approving the settlement. *See Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 354 F.3d 1246, 1268 (10th Cir. 2004) (rejecting a similar challenge to an order approving a settlement by explaining that the district court need do no more than provide "some basis for distinguishing [on appellate review] between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law" (quoting *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972))).

(2) Objectors did not preserve their challenge to the adequacy of Subclass 1 representatives; (3) notice of the proposed settlement was adequate; and (4) the released claims share a factual predicate with the claims asserted in the complaint.

### A. The Fairness of the Settlement Agreement

The district court may approve a proposed settlement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). We review the district court's decision to approve a class settlement for an abuse of discretion. *Tennille v. W. Union Co.*, 785 F.3d 422, 434 (10th Cir. 2015). Thus, "we will not disturb the determination absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002) (quotation marks omitted).

Like the district court, our review focuses on whether "(1) the settlement was fairly and honestly negotiated, (2) serious legal and factual questions placed the litigation's outcome in doubt, (3) the immediate recovery was more valuable than the mere possibility of a more favorable outcome after further litigation, and (4) [the parties] believed the settlement was fair and reasonable." *Tennille*, 785 F.3d at 434 (alteration in original) (quotation marks omitted); *see Weinman v. Fid. Capital Appreciation Fund (In re Integra Realty Res., Inc.)*, 354 F.3d 1246, 1266 (10th Cir. 2004).

Objectors do not structure their arguments to correspond to the controlling *Tennille* factors; instead they advance general attacks on the fairness of the

8

settlement agreement. Thus, we review the district court's analysis within the context of the *Tennille* factors, addressing Objectors' arguments alongside the factor to which they best correspond.

### 1. The Settlement was Fairly and Honestly Negotiated

As to the first factor, the district court found, and Objectors do not directly dispute, that the settlement agreement was "the product of good faith arm's length negotiations between the Parties who are represented by very experienced and capable counsel." App. at 1461. Some of Objectors' other fairness arguments, as well as their attack on the breadth of the settlement's release, might rest on an implication that the settlement was not fairly negotiated. But Objectors make no specific assertion on appeal that the settlement was not reached through a fair and honest negotiation process. We therefore see no error in the district court's conclusion that it was.

### 2. Serious Legal and Factual Questions Placed the Litigation's Outcome in Doubt

With respect to the second *Tennille* factor, we easily conclude that serious legal and factual questions placed in doubt the outcome of litigation about the deductions TEP could take from royalty payments made to Subclass 1. The crux of the dispute between Objectors and Appellees over the value of Subclass 1 royalties relates to the interpretation of the language permitting TEP to deduct the costs of "transporting gas 'from the mouth of the well to the point of sale.'" App. at 983. Objectors contend that the presence of "transporting" or "transportation" in these

9

instruments narrows the much broader clause that follows—"from the mouth of the well to the point of sale"—thereby excluding the deduction of any costs for gathering or fuel. Appellees, by contrast, assert that both gathering and fuel costs are encompassed in the process of transporting gas "from the mouth of the well to the point of sale." App. at 983. The evidence adduced at the fairness hearing adequately established a substantial risk that, if litigated, Objectors' gathering limitation argument would be rejected on its merits. For example, Subclass 1 representative Ms. Jerman confirmed that she was not "aware of any means by which gas would get from . . . the mouth of the well to a processing plant other than through a gathering system." App. at 1582.

Thus, setting aside the time, expense, and delayed recovery attendant to more litigation, Subclass 1 members faced a legitimate risk of recovering none of the fuel repayments they enjoy under the *Sefcovic* SA. And even if they secured those repayments, the victory could have been meaningless if it was combined with an adverse ruling on TEP's counterclaim seeking an offset of ad valorem tax liability allegedly triggered by such repayments. By agreement of the parties, TEP's counterclaim was dismissed by the district court's order approving the *Sefcovic* SA.

### 3. The Immediate Recovery was More Valuable Than the Mere Possibility of a More Favorable Outcome After Further Litigation

Relevant to this *Tennille* factor, Objectors claim there can be no worse position for Subclass 1 members than the one they occupy by virtue of the *Sefcovic* SA. This is so, Objectors insist, for two reasons. First, Objectors claim the agreement resolves

10

the purportedly uncertain meaning of "from the mouth of the well to the point of sale" against them. Second, they contend the *Sefcovic* SA permits TEP to recoup charges that were not incurred during the relevant period and that completely offset the settlement money allocated to Subclass 1.

Objectors' first argument appears based, primarily, on the fact that the *Lindauer* SA had secured for category two and category three owners (Subclass 1 members in this litigation) repayment of some deductions TEP will be permitted to deduct prospectively under the *Sefcovic* SA. They suggest that because a dispute about the meaning of those royalty instruments yielded remuneration in the *Lindauer* SA, the contractual language must have more settlement value than the *Sefcovic* SA achieves for Subclass 1 members. But Objectors overstate the effect of the *Lindauer* SA. There, the parties were unable to resolve the meaning of the deduction provisions in category two and category three royalty instruments and left the issue unresolved. The *Lindauer* SA did include a lump sum payment to category 2 and category 3 owners, which counsel for Objectors claims was intended as recoupment of the disputed deductions. But TEP disagrees about the purpose of the lump sum payment and argues that after the *Lindauer* SA, WPX continued to deduct the disputed costs.

To be sure, WPX paid a lump sum to end the *Lindauer* litigation. But in doing so, it never conceded that such deductions were impermissible. WPX then transferred whatever rights it had in the royalty instruments to TEP, and TEP interpreted the provisions in the Subclass 1 royalty instruments as allowing for the deductions for fuel and gathering costs from the mouth of the well to the point of sale. Given the

11

language of the royalty instruments held by Subclass 1 members, TEP had a strong argument it was permitted to do so, and the *Lindauer* settlement payment does not diminish the strength of that argument.

It is also true that under the *Sefcovic* SA, Objectors received immediate compensation in exchange for their release of claims. This compensation took the form of repayment of "the equivalent of (a) 50% of all processing costs deducted from their payments since July 2016, and (b) over 40% of all fuel costs deducted from their payments since July 2011." App. at 1190. Had the case proceeded to trial, there is no guarantee Subclass 1 members would have been entitled to any repayment of processing or fuel costs. Because the outcome of this litigation was, at best, uncertain, and because Subclass 1 members obtained immediate recovery of a portion of past deductions, the district court did not abuse its discretion in determining that "the immediate recovery was more valuable than the mere possibility of a more favorable outcome after further litigation." *Tennille*, 785 F.3d at 434.

As to Objectors' second argument—that the *Sefcovic* SA's recoupment provision completely offsets the settlement money—the record before the district court is sparse, presumably because this argument was not the focus of the proceedings below. The expert testimony offered to quantify the potential recoupment liability of Subclass 1 members is terse and undeveloped. But as we now explain, TEP's accounting expert, Alan Simpson, provided an explanation for his conclusion that can be understood and verified. In turn, Objector's expert, Mary Ellen Denomy, provided an opinion untethered to any rational analysis. Under these

12

circumstances, we cannot conclude the district court abused its discretion in rejecting Objectors' argument that ¶ 9.b rendered the *Sefcovic* SA fundamentally unfair.

Under ¶ 9.b of the *Sefcovic* SA, TEP is permitted "to recoup any overpayments made to Class members prior to the Effective Date as a result of not deducting allowable post-production costs." App. at 314. Objectors did not assert any complaint about ¶ 9.b in their initial objections or in their brief submitted in advance of the fairness hearing. Instead, they focused their written materials on the unfairness of the method for prospectively calculating royalties for Subclass 1 members under ¶ 9.a.

To the extent either party elicited testimony about the impact of ¶ 9.b at the fairness hearing, it was limited. On direct examination, TEP's counsel asked his accounting expert, Alan Simpson, about the gathering and fuel deductions for Subclass 1 owners. Mr. Simpson explained that "[d]uring the WPX era, there were deductions to the subclass 1 owners for both gathering transportation and for fuel." App. at 1621. The district court interjected at that point, asking Mr. Simpson to clarify what he meant by "gathering transportation." App. at 1621. In response, Mr. Simpson explained that he considers "there to be three legs of transportation in the natural gas industry." App. at 1622. He describes the first leg to be "gathering transportation," which includes moving the "gas from the mouth of the well typically to the inlet of the gas plant but sometimes to the inlet of another pipeline." App. at 1622. And he further indicated that his testimony was concerned with the costs incurred during that first leg.

13

Considering that first leg of gathering transportation, Mr. Simpson testified he had reviewed the paid history data and royalty payment statements for Subclass 1 members from July 2011 through June of 2016. The paid history data, as Mr. Simpson explained, contains more detail about the costs incurred by WPX after the gas leaves the well, or "post-production," than the royalty payment statements. By comparing these two sets of documents, Mr. Simpson determined which costs incurred by WPX had been deducted from royalty payments and which had not. That is, he identified post-production costs recorded in the paid history data but not also listed as deductions on the royalty payment statements.

Specifically, Mr. Simpson identified three categories of post-production costs recorded in the paid history data: FUEL, BGTHRI, and MKRGT3. According to Mr. Simpson, these categories reflected costs incurred for fuel (FUEL) and gathering (BGTHRI) and (MKRGT3). He then reviewed the payment history for each of the Objectors and determined that these gathering and fuel deductions had already been subtracted by WPX from the Objectors' royalty payments.

Class counsel then asked Mr. Simpson to focus on the settlement as it relates to Subclass 1 owners generally. First, Mr. Simpson explained that the settlement included a reimbursement of 38% of the fuel costs deducted from royalty payments prior to July 2016. Next, counsel asked Mr. Simpson to address the impact of ¶ 9.b on Subclass 1 members. Again, Mr. Simpson compared the payment history data with the royalty payment data to determine whether there were outstanding post-production costs that had not previously been deducted from royalty payments and

14

might, therefore, be recouped under ¶ 9.b. He concluded: "For certain individuals, maybe for certain wells and certain time periods, there were categories of expenses that [Mr. Simpson] believed were not deducted by TEP . . . ." App. at 1628. Mr. Simpson identified those undeducted costs as what TEP may recoup from future royalty payments under ¶ 9.b. TEP's counsel then asked Mr. Simpson to estimate those costs:

> Q: Have you had the opportunity in preparing for today's hearing to evaluate any data that would identify for you how much TEP would be recouping for the time period covered by the settlement for all owners in connection with these NGL transportation and fractionation costs?
>
> A: I have seen the results of an analysis of that, yes.
>
> Q: How much is it?
>
> A: It amounted to $275,000 or thereabouts.
>
> Q: And is that specific to one subclass or is that for all owners, all 608 owners in the Sefcovic settlement class?
>
> A: That was across all categories of leases in the Sefcovic case.
>
> Q: Now, with respect to just subclass 1, do you know how much of that total $275,000 is associated with potential recoupment of overpayments to subclass 1 owners?
>
> A: What I saw was less than a thousand dollars related to subclass 1.

App. at 1629.

Thus, Mr. Simpson testified to a recoupment calculation based on post-production costs reflected on the paid history data records that had not already been deducted from royalty payment statements. Those calculations resulted in a total of $275,000 of post-production costs for all classes during the relevant time period that

15

had not been deducted from royalty payments. And, of that $275,000, Mr. Simpson testified that less than $1,000 was attributed to Subclass 1 owners.[5]

Mr. Simpson's testimony explains exactly how he calculated the potential liability to Subclass 1 members under ¶ 9.b, and why he used that method. His calculations were also supported by WPX's contemporaneous records documenting post-production costs incurred and the costs deducted from royalty payments. And Objectors did not challenge these calculations, Mr. Simpson's methodology, or elicit any contrary information on cross examination.

At oral argument on appeal, Objectors' counsel pointed us to a portion of the direct examination of their expert, Ms. Denomy, as evidence that the recoupment rights under ¶ 9.b render the *Sefcovic* SA fundamentally unfair. Based on review of that testimony, it is not surprising the district court was unconvinced. Although Ms. Denomy did opine that Subclass 1 members could be liable for $4 million in recoupment obligations, the explanation of that opinion is lacking.

During the fairness hearing, Ms. Denomy agreed with Mr. Simpson that not all gathering costs[6] had been deducted from the royalty payments during the period

---

[5] As explained, Mr. Simpson concluded that none of those unpaid amounts was attributed to any of the Objectors.

[6] The record does not reflect what costs Ms. Denomy included as "gathering costs," but there is nothing to suggest she disagreed with Mr. Simpson's identification of the post-production gathering costs identified as BGTHRI, and MKRGT3 in WXP's paid history records. And because the discussion was related to ¶ 9.b of the *Sefcovic* SA, it is also fair to assume she was focused on post-production costs. *See Sefcovic* SA, at ¶ 9.b (allowing recoupment of "any overpayments made to

16

covered by ¶ 9.b: "because there were two gathering fees listed in June of 2016 and only one of those two [was] deducted . . . the potential for them to collect that second gathering fee is there." App. at 1640–41. But rather than consulting the paid history data records to determine whether, in fact, there were any costs incurred by WPX for post-production costs but not deducted, Ms. Denomy compared the amount WPX deducted for gathering fees and fuel in June 2016 to the amount TEP deducted for such fees when it took over. She then concluded, without explanation, that the difference between the 21 cents deducted by WPX and the 59 cents deducted by TEP "reflect[s] the difference between accounting for both of those gathering [costs]." App. at 1641. Finally, Objectors' counsel asked "how much could they take since this new amount is authorized under this proposed settlement going back from class 2 and class 3?" App. at 1642. Ms. Denomy responded, "[a]bout $4 million." *Id.*

But there is no evidence in the record explaining the increase from 21 cents to 59 cents, and certainly no evidence tying that difference to post-production costs that might be recouped under ¶ 9.b. Nor is there any explanation why WPX would have incurred $3.725 million in post-production costs that it did not include in its paid history data—the $4 million claimed by Ms. Denomy, less the $275,000 calculated by Mr. Simpson from those records. But even if the thirty-eight cent difference was somehow relevant to post-production costs, Ms. Denomy failed to explain how she

Class members prior to the Effective Date as a result of not deducting allowable post-production costs") App. at 314.

17

expanded that difference to a total recoupment liability for Subclass 1 members of $4 million.[7]

The district court received conflicting testimony about an issue that was not then central to the proceeding. Mr. Simpson explained his methodology such that his calculations could be understood, verified, and replicated. In contrast, Objectors offered a theory of Subclass 1 liability under ¶ 9.b based on speculation and containing gaps in analysis that make it impossible to assess the accuracy of the calculation. Given this meager record, Objectors have failed to meet their burden to establish the factual basis for their objection to ¶ 9.b. As a result, we cannot conclude the district court abused its discretion by approving a settlement agreement containing the recoupment provision. *See Miller v. Woodmoor Corp.*, 619 F.2d 65, 67 (10th Cir. 1980) ("The parties to the settlement supported their conclusions to the satisfaction of the court and the objectors had every opportunity to show that the settlement was unfair to them and their class. This is enough.").

### 4. The Parties Believed the Settlement was Fair and Reasonable

Finally, the fourth *Tennille* factor asks whether the parties "believed the settlement was fair and reasonable." *Tennille*, 785 F.3d at 434. As the district court

---

[7] TEP has affirmatively represented to both the district court and this court that the recoupment it is entitled to under ¶9.b totals about $1,000 for all of Subclass 1. And at the fairness hearing, Mr. Simpson testified that there are no post-production costs that have not been deducted from the Objectors' royalty payments. In the event TEP seeks instead to recoup a greater sum from Subclass 1 members, nothing in the *Sefcovic* SA precludes those members from bringing a legal action to challenge that conduct, which would be highly suspect due to TEP counsel's representations to the district court.

18

observed, Subclass 1 members were "aware of . . . uncertainties" in their royalty agreements under the *Lindauer* SA and "believe[d] this [*Sefcovic*] Settlement Agreement [was] in their best interests." App. at 1460. Indeed, Appellees assert, and Objectors do not dispute, that of 607 class members, only the four Objectors in this case challenged the reasonableness of the *Sefcovic* SA. *See Fager v. CenturyLink Commc'ns, LLC*, 854 F.3d 1167, 1175 (10th Cir. 2016) (finding no clear error in district court's conclusion that settlement was fair in part because "only a few class members opted out" and only one filed an objection); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) ("If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." (quotation marks omitted)).

In summary, the district court did not abuse its discretion in finding that the *Sefcovic* SA is fair.

## B. Adequacy of Class Representation

Objectors next assert a variety of arguments in support of their contention that Subclass 1 representatives did not adequately represent the interests of absent Subclass 1 members. Because Objectors failed to raise this issue in the district court despite ample opportunity to do so, we will not consider it on appeal.

Parties may not preserve a challenge "by presenting the issue to the district court in a vague and ambiguous manner." *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (10th Cir. 2009) (internal quotation marks omitted). Rather, to preserve an issue for appeal, a party must "alert[] the district

19

court to the issue and seek[] a ruling." *Id.* (quotation marks omitted). A fleeting reference will not suffice. *Id.*; *see Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233–34 (10th Cir. 1997) (holding a single paragraph containing a "fleeting contention" deprived the court below "of the opportunity to analyze and rule on th[e] issue now raised in detail for the first time on appeal").

Objectors say they raised the issue before the district court with the following paragraph in their "Hearing Brief Regarding Objections to Approval of Proposed Class Settlement":

> The structure of this proposed settlement creates an illusory common fund (to be recouped by defendant from ¶9.a. deductions and without adequate disclosure to absent class members in the Notice), together with the unconscionably overbroad release of extremely valuable uncompensated class claims. This structure is highly suggestive of collusion, and/or inadequate representation. Strict scrutiny by this Court is required to vigilantly guard the interests of absent class members and to insure the "identical factual predicate" standard is complied with.

App. at 1391. This paragraph, appearing in a section challenging the scope of the settlement agreement's release of claims, is the extent of Objectors' argument on inadequate representation in the district court.

Nonetheless, Objectors claim they preserved this argument because (1) they "elicited testimony supporting the allegation of inadequate representation at the Fairness Hearing itself," Aplt. Reply Br. at 15, and (2) the district court ruled on the adequacy of class representation. This argument is unavailing. The parties must *raise* an issue to preserve it for appeal. *See U.S. Aviation*, 582 F.3d at 1147 (holding issue

20

preserved when "[t]he parties argued, and the district court definitively ruled on, the precise objection raised on appeal").

Objectors may not use the district court's one-sentence finding that class representatives were adequate to assert arguments on appeal that were never presented to the district court. Nor can they rely on a fleeting reference to "and/or inadequate representation" in a portion of a brief challenging the scope of the settlement's release of claims. Nothing in the Objectors' written submissions or argument would have put the district court on notice that it was being presented with substantive arguments challenging the adequacy of representation. Objectors arguments are therefore waived.

### C. Adequacy of the Settlement Notice

Objectors next argue they received insufficient notice of the *Sefcovic* SA. Under Fed. R. Civ. P. 23(e)(1)(B), a district court approving a proposed class action settlement "must direct notice in a reasonable manner to all class members who would be bound by the proposal."

Notice in this context has two aspects: constitutional due process and the requirements of Fed. R. Civ. P. 23. *See Tennille*, 785 F.3d at 436. "We review de novo questions of notice that implicate due process," and then "[w]ithin the bounds of due process, . . . the form that such notice is to take is left to the discretion of the district court." *Id.* (alterations in original) (quotation marks omitted).

The notice explained, in relevant part, as follows:

21

Plaintiffs have alleged that, at various times since July 1, 2011, TEP deducted or adjusted from royalties certain charges for costs that should not have been deducted. Specifically, Plaintiffs have asserted that TEP should not have deducted from Gas royalties certain costs that were not permissible to deduct under the terms of a class action settlement agreement approved by a Colorado state district court in a lawsuit captioned *Ivo Lindauer v. Williams Production RMT Co.*, Case No. 2006-CV-0317 (Garfield County District Court) (the "*Lindauer* Settlement"). These deductions are referred to in this Notice as "Disputed Deductions."

. . .

Upon final Court approval, all members of the TEP Settlement Class who choose not to timely exclude themselves from the TEP Settlement Class (*i.e.*, who do not "opt out" of the TEP Settlement Class) will receive the monetary benefits of the TEP Settlement and will be bound by the resulting Order in the Lawsuit, barring them from bringing any claim against TEP related to royalty calculations that are covered by the TEP Settlement Agreement ("Settled Claims"). If a member of the TEP Settlement Class does not opt out, that member will receive payment of a portion of the Settlement Fund as described above, and may not thereafter bring Claims.

App. at 888–90.

The notice explained the calculation of future royalties to class members, that recipients could opt out of the *Sefcovic* SA, and that remaining in the class would result in class members receiving their share of the settlement fund and "[r]eleas[ing] all Settled Claims" against TEP. App. at 890. The notice also gave contact information for class counsel and provided information about how to access the full *Sefcovic* SA online. App. at 892.

Objectors do not appear to challenge the notice's compliance with Rule 23, but they do make a variety of objections to the notice's specificity. They argue the notice should have mentioned "[t]he gathering and fuel deduction claims," the possibility that TEP might recoup past deductions in future royalty payments, and the value or

22

amount of various deductions under the *Sefcovic* SA. Aplt. Br. at 36–37. Objectors also assert the notice failed to elaborate on the breadth of claims class members would release by not opting out. *Id.* at 37.

But Objectors point to no authority requiring class notice to reach that level of specificity. The notice here described the general nature of the claims, as well as the method TEP would use to calculate future royalty payments. The notice thus "adequately apprised putative class members of the nature of the claims at issue." *Tennille*, 785 F.3d at 437; *see also Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 423 (6th Cir. 2012) ("All that the notice must do is 'fairly apprise . . . prospective members of the class of the terms of the proposed settlement' so that class members may come to their own conclusions about whether the settlement serves their interests." (alteration in original) (quoting *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975))). The notice also accurately explained that the decision to not opt out would result in the release of "any claim against TEP related to royalty calculations that are covered by the TEP Settlement Agreement." App. at 890. Finally, the notice "informed putative class members how to obtain more information about the settlement, directing them to [a] website, where they could get a copy of the Settlement Agreement." *Tennille*, 785 F.3d at 437. If any class member desired more detail, the notice "inform[ed] class members of several ways they could obtain additional information about the claims that they would be releasing if they joined the settlement." *Id.* Because the notice satisfied the

23

requirements of Rule 23 and the constitutional demands of due process, we reject Objectors' contention that the class settlement notice was deficient.

### D. The Breadth of Released Claims

Finally, Objectors argue the *Sefcovic* SA contains an overly broad release. The *Sefcovic* SA release provides that the class members

> release TEP and its predecessors . . . from any and all liabilities, rights, claims, demands, obligations, damages (including claims for or award of costs and/or expenses, court costs and attorneys' fees), losses, causes of action in law or in equity arising from the calculation and/or payment of royalties and/or overriding royalties to Plaintiffs and the Class on the sale of natural gas, natural gas liquids, and associated hydrocarbons prior to the Effective Date.

App. at 1472.

Under the identical factual predicate rule, "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action." *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982); *see Fager*, 854 F.3d at 1175. Under this principle, "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) (quoting *TBK Partners, Ltd.*, 675 F.2d at 460.) "[A] court may release not only those claims alleged in the complaint and before the court, but also claims which 'could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981) (quoting *Patterson v. Stovall*, 528

24

F.2d 108, 110 n.2 (7th Cir. 1976), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)).

Objectors contend the "factual predicate" at issue in this lawsuit concerns only the following: (1) allegations that TEP breached the terms of Subclass 1 leases by deducting costs in excess of reasonable transportation costs, and (2) allegations that TEP breached the *Lindauer* SA by deducting costs in excess of "the express limitations in Section 4 of the *Lindauer* [SA]."[8] Aplt. Br. at 30–31. Because the *Sefcovic* SA releases all future claims "arising from the calculation and/or payment of royalties and/or overriding royalties to Plaintiffs and the Class on the sale of natural gas, natural gas liquids, and associated hydrocarbons," Objectors contend that it contravenes the identical factual predicate rule. We disagree.

"[I]nherent in the nature of a class-action settlement is the release of the claims of every class member (except those who opt out)." *Fager*, 854 F.3d at 1176. And "[i]f Defendants are going to pay anything to the class members, they would insist on a release . . . that would protect them against repeated litigation over the same subject matter." *Id.* at 1173.

"When considering the permissibility of a release, the overlap between elements of *claims* is not dispositive." *Wal-Mart Stores, Inc.*, 396 F.3d at 108. Instead, we focus on the factual predicate of the settled claims. *See id.* ("Class

---

[8] Section 4 of the *Lindauer* SA relates to the calculation of future royalty payments.

25

actions may release claims, even if not pled, when such claims arise out of the same factual predicate as settled class claims.").

The factual predicate of this action, as stated in the Second Amended Complaint, is that "TEP has underpaid royalties owed to [Plaintiffs] under numerous leases and overriding royalty agreements which are subject to certain future royalty payment provisions which are set forth in the [*Lindauer* SA]." App. at 1158–59. The complaint broadly alleged that TEP had breached the Subclass I royalty agreements, the Subclass II royalty agreements, the Subclass III royalty agreements, and the Subclass IV royalty agreements.

Objectors' position, that the settled claims must be "limited to three types of cost deductions – improper gathering, fuel[,] and excess processing cost deductions from residue gas royalty [sic]," Aplt. Br. at 32, "takes an overly narrow view of the factual predicate of [plaintiffs'] claims." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011). Although certain claims in the *Sefcovic* complaint focused on erroneous deductions, "including, *but not limited to*, gathering, fuel, and processing," App. at 1176 (emphasis added), the complaint made specific reference to various other alleged errors in TEP's calculation and payment of royalty obligations:

- "failing to pay royalties based upon first commercial market prices for residue gas," App. at 1174

- "failing to pay royalties based upon first commercial market prices for marketable natural gas liquid products," App. at 1174

26

- "failing to properly account for the correct value of the natural gas liquid components" as required by the *Lindauer* SA, App. at 1175

- "failing to properly account for the selling price of . . . residue gas" as required by the *Lindauer* SA, App. at 1176

In short, the *Sefcovic* complaint alleged an array of errors in the calculation and payment of royalties to the *Sefcovic* class based on the sale of natural gas and similar products, and this is precisely what the release purports to cover. *See* App. at 1472 (releasing TEP from liability "arising from the calculation and/or payment of royalties and/or overriding royalties to Plaintiffs and the Class on the sale of natural gas, natural gas liquids, and associated hydrocarbons prior to the Effective Date").

Objectors recite a "vast universe" of claims they believe would be covered by the subject release.[9] It is doubtful that all such claims would be encompassed within the release, but to the extent they are, we conclude they share a factual predicate with the matters alleged in the complaint. We therefore see no error in the district court's approval of this release.

## III.    CONCLUSION

For the reasons articulated, the district court did not abuse its discretion in approving the *Sefcovic* SA. Judgment is **AFFIRMED.**

Entered for the Court


Carolyn B. McHugh
Circuit Judge

---

[9] We note that if the *Sefcovic* SA release is overly broad, so too is the release in the *Lindauer* SA, which was negotiated by Objectors' counsel and which elicited no challenge from the Objectors.